DRIGGERS vs UNITED STATES.

Opinion delivered Sept. 26, 1907.

(104 S.W. Rep. 1166.)

1. *Criminal Law—Evidence—Hearsay.*

As hearsay the testimony of a witness in a murder trial in regard to conduct and threats seen and heard by him, was not objectionable.

2. *Criminal Law—Conspiracy.*

Evidence in a murder trial was held to show that there was a conspiracy which resulted in death of decedent at the time threats were

made against him and therefore admissible against any one who afterward entered into such conspiracy.

3. *Same—Instructions.*

Where the instructions requested were covered by the general charge, it was not error when the requested instructions were refused.

4. *Homicide—Justifiable.*

By Mansf. Dig. § 1547 (Ind. Ter. Ann St. 1899, § 890) justifiable homicide is the killing of a person in self defense or in defense of property. By Section 1665, Mansf. Dig. (Ind. Ter. Ann St. 1899 § 1008) it is felony for a person to willfully or maliciously destroy any fence or inclosure. *Held*: That decedent did not commit a felony justifying homicide, when he placed his hand on a post, not to destroy the fence but to make a gap through which his cattle could be driven into the field, especially when he had a right known to defendant.

5. *Criminal Law—Appeal.*

Where there was objection made or exception saved to a charge of self-defense, in a trial for murder, the charge cannot be reviewed on appeal.

6. *Criminal Law—Accomplices.*

It is for the jury to determine whether a witness is an accomplice requiring corroboration to support a conviction. · Therefore it was sufficient to instruct that under Mansf. Dig. § 225-9 (Ind. Ter. Ann. St. 1899 § 1602) conviction could not be had on the testimony of an accomplice, unless it was corroborated, and there was·no error in ceasing to charge witness with being an accomplice.

7. *Same—Instructions.*

If the word "accomplice" is regarded by defendant as a technical term to be defined by the court, he should make such request, but should not ask that an instruction be given that a certain witness is an accomplice; that is a question for the jury to determine.

8. *Homicide—Murder.*

There are other malicious elements besides ill will which would constitute a killing a murder, for any unlawful cause or motive is a sufficient element.

9. *Same—Instructions—Combat.*

If defendant believed a field belonging to him to have been taken possession of by decedent, where decedent with others would be, armed with deadly weapons, and therefore organized and armed a company of men and himself, and went to place of killing to meet

decedent, and conflict ensued in which decedent was killed, then the charge that such conflict was mutual combat and all the parties thereto could not claim defense as they were guilty of murder, was correct.

10. *Same—Appeal.*

Defendant contended that decedent committed a felony· justifying killing, when he attempted to tear down his fence. Evidence was introduced to the effect that on the evening of the day of the killing witness said decedent had his hand on the post and witness testified for prosecution that decedent did not have his hand on the post. Prosecution then introduced evidence to the effect that on the day after the killing witness related the story as told by him at the trial. It was held that though such corroborative evidence was erroneously admitted, its admission was not prejudicial error, since the tearing down of the fence did not constitute a felony justifying a killing and evidence tended to show murder, and the evidence of the prosecution, including that admitted erroneously, tended to show that decedent was not killed because of 'a motive which would constitute murder and therefore was in favor of defendant.

Error to the United States Court for the Southern District of the Indian Territory; before Justice J. T. Dickerson, June 21, 1905.

B. F. Driggers was convicted of murder, and he brings error. Affirmed.

The plaintiff in error, B. F. Driggers, with five others, to wit, L. W. Goff, Tom McCarter, Tom Morgan, Ted Bennett, and John Underwood, was on the 13th day of October, 1903, indicted at Ada, in the Southern district, upon a charge of murder. There are four counts in the indictment. The first count alleges that plaintiff in error, Driggers, with a certain Winchester rifle, loaded, etc., did, under such circumstances as to constitute the crime of murder, slay and kill one Robert G. Brady, and that the others, his co-defendants, were present, aiding, abetting, and assisting him in the unlawful and malicious murder. The second, third, and fourth counts are identical with the first, except the second charges McCarter

as principal in the first degree, and all of the others as principals in the second degree. The third count charges Ted Bennett as principal in the first degree, with the others as principals in the second degree, and the fourth count is the same, except John Underwood is charged as principal in the first degree. After the trial and conviction of Goff, at Ada, the venue was changed and the cause transferred to Pauls Valley, where a nolle prosequi was entered as to the others, and Driggers was placed upon trial, resulting in a verdict of guilty without capital punishment. A motion for new trial was filed and overruled, and the case regularly brought here by writ of error. The facts upon which the indictment was predicated were as follows: One J. C. McNeal was the lessee of a certain farm, which, for the year 1902, he had rented to two men by the name of Goff and Riley, who raised that year a crop of corn on one part of the place and a crop of cotton on another part, the two crops joining each other, with no fence between them. After gathering the crop of corn in the fall of the year, Goff and Riley sold the field of stalks, which were left standing, to the defendant Driggers; but, because of the fact that Goff and Riley had not finished gathering their crop of cotton, the defendant Driggers could not turn his cattle in the field without damage to the cotton, until after the 1st of January, 1903, which was, of course, after the termination of the Goff and Riley lease. In the meantime McNeal, the original lessee, leased the premises to Brady, the deceased, for the year 1903, which gave to him the right of possession on January 1, 1903. It was claimed, however, by the defendant at the trial that Goff had also rented the place from McNeal for that year. This was denied by McNeal, but there was some proof offered tending to establish such an agreement. On January 2, 1903, the deceased entered upon the land and built a cross-fence, dividing the field of stalks from the field of cotton, with the intention of driving his cattle in the field of stalks the next day. This fact became known

to Goff and the defendant on the afternoon of January 2d.  On
the evening and night of that day they went to various places
in the neighborhood, procuring Winchester rifles and guns and
ammunition for the purpose of using them to prevent deceased
from entering with his cattle the next day.   In the meantime
the deceased had learned that these men were preparing to re-
sist any attempt he might make to enter the premises, and
armed himself with a pistol, and the next morning, January
3d, he, with four other men, drove a herd of cattle belonging
to the deceased to the disputed premises, with the intention, it
is claimed, of turning them into the field of cornstalks.  When
they arrived at the place, they found the defendant and Goff,
and two full-blood Indians, McCarter and Underwood, and
two others, all armed with Winchester rifles and shotguns,
standing inside the field.   The cattle were being driven through
a lane which separated the premises in dispute from those of a
Mr. Hogan Keel.   About opposite the cross-fence which deceased
had put up on the day before, and on the other side of the lane
leading into Mr. Keel's premises, there was a gate.   When the
cattle arrived at the gate, it being open or down, a few of them
ran through into Mr. Keel's premises.   The deceased went in
and drove them out into the lane, and dismounted from his
horse.   From the government's proof, he dismounted for the
purpose of readjusting his saddle blanket, which had slipped
back, and made no effort to get his pistol.   The testimony of
the defendant on this point was to the effect that the deceased
jumped from his horse, and with one hand seized a post as if
to pull down the fence, so that the cattle could enter, and
with the other had seized his pistol and was in the act of drawing
it when the defendant Driggers fired at him with a shotgun
loaded with BB shot, and killed him.   Whichever contention
be true, it is certain that Brady fell with his pistol in his pocket.
It had not been drawn.   Defendant then fired at Kelley, wound-
ing him and killing his horse.   Some eight or ten shots were
fired, all by the defendant's party.

*C. C. Potter, H. M. Carr, Crawford & McKown, Cruce, Cruce & Blakemore,* and *Moman Pruiett,* for plaintiff in error.

*Messrs. George R. Walker,* U. S. Atty., and *James E. Humphrey,* Asst. U. S. Atty.

CLAYTON, J. (after stating the facts as above). In the assignment of errors filed by plaintiff in error there are 25 specifications. The first and second are the usual ones that the verdict is contrary to the law and the evidence. Four of them go to the alleged errors of the court in admitting testimony over the objection of plaintiff in error; 12 go to the action of the court in refusing requested instructions to the jury; 5 to the general charge, and 2 complain of the overruling of the motion for new trial.

We will first consider the question of the competency and admissibility of the testimony objected to by plaintiff in error at the trial. The first exception on this point was made to the testimony of the witness, T. L. Kelley, as follows: "Q. What time did you get to Brady's house on Monday before the shooting? A. It must have been 1 or 2 o'clock. Q. What did you do that afternoon? A. I went to McNeal's place over there, where this killing occurred. Q. Well, who did you see over there? A. I seen Goff there and Tom Potter that evening. Q. Just go ahead and tell the jury all the circumstances that occurred there that evening. A. I went over there with Brady and some work hands. I went over there to see Goff about a store account he had. I was instructed to tell Goff to get off that place, and to leave some rents he owed on the place. He had rented the place to Brady. Q. What was Brady doing there? A. He was running a fence between some cotton and corn stubble. Q. When did you see Goff with reference to going over there and building that crossfence? A. It was a little bit late in the evening. Goff came out to where we were working building the fence. Goff says: What the hell are you fellows doing here? This is my land.'

I told him McNeal had rented the place to Brady. I walked on down the lane a piece, and walked on up to where Brady was. Goff, it seems to me, stayed there a while, and went back and came back with an Indian, Tom McCarter. Q. What was then said? A. Well, there wasn't a great deal said, any more than Brady told him. He says he didn't want to hear any more of his noise. I told him what McNeal told me to tell him. Q. Well, proceed. What was said by Goff? A. Goff cursed a great deal. Q. What did he say? A. He said: 'If you put any cattle in here'—I understood him to say he would kill the cattle. As we started away, he said: 'If you put any cattle in here, I will kill you.' He stood there and talked, and he says: 'Put them in, and I will be with you, God damn you.' Brady didn't seem to pay any attention to him. Q. But went ahead with the building of the cross-fence? A. Yes, sir; I asked Goff if he was going to pay his account or make any arrangements to make it safe. He wouldn't give me any satisfaction." To this testimony the defendant objected on the ground that it was incompetent, irrelevant, immaterial, and hearsay. In their brief counsel for plaintiff in error take the position that this testimony is incompetent, because the actions and threats of Goff and McCarter were made in the absence of the defendant, and at a time before any conspiracy is shown to have existed, and therefore cannot be used as against the defendant Driggers. It is clearly not hearsay. The testimony of Kelley is a statement of facts to which he was an eyewitness, to wit, the conduct and threats of Goff against Brady in the presence of McCarter. There is no doubt but that the conduct and threats of a conspirator, either before the conspiracy has begun, or after its purpose has been consummated, cannot be given in evidence as against a co-conspirator. "Where a person joins a conspiracy already existing, he thereby ratifies any acts done or threats previously made by the conspirators in furtherance of the common design; but, in order

to fasten the guilt of such antecedent acts or threats on such newly joined conspirator, it is a sine quo non to establish the fact that the conspiracy was afoot when the acts were done or the threats made." State vs May, 142 Mo. 136, 43 S. W. 637; 3 Greenleaf, Ev. 94; 1 Bishop, New Crim. Proc. 1248. Upon this point it is therefore important to determine whether at the time the threats of Goff were made there is evidence that the conspiracy was afoot; not that the defendant Driggers was a member of it, but had the unlawful combination which resulted in the killing begun? If so, and defendant Driggers afterward entered into the unlawful combination, he would be held, in law, responsible for the threats of Goff to the same extent as if he himself had made them.

When Goff first came to the field where Brady was putting up the fence, he came alone, passed a few words, and then left, and in a short time returned with McCarter, one of the parties indicted jointly with Driggers, Goff, and others, and then it was that he used to Brady the threatening language, and cursed him. Goff and McCarter left together. What purpose Goff had in going for and bringing McCarter to the place, or McCarter had in going with Goff, is not disclosed by the positive proof, and therefore can only be ascertained by the circumstances occurring at the time and immediately following. After leaving the field the second time, Goff went at once to defendant Driggers' home. Driggers was absent, and Goff told his wife of the occurrence up at the field, and left word with her to tell Driggers to come and see him as soon as he got home. McCarter, when he left the field, went home and found the codefendant, Underwood, who had a gun, there. They went at once to the home of a man by the name of McDowell, and there borrowed from him a quarter of a dollar, with which to buy cartridges. McCarter then went to Statler's store to get the cartridges. This was after dark. Failing to get them, he returned to his home. A short time after McCarter left Statler's store, Driggers

and Goff came to the store and Driggers bought three 45 Win-
chester cartridges and a box of No. 12 BB shot, and informed
Statler that he would "probably hear something drop next
morning." Goff got two guns that night, and, after getting
the guns and cartridges, they went to McCarter's. They were
out until 2 o'clock in the morning. Driggers, in his testimony,
says: "Goff got up the crowd." Taking all of these facts
together, we think the testimony shows, circumstantially at
least, that the beginning of the combination which resulted
in the death of Brady was not later than when Goff and McCarter
got together after Goff first left the field. They were the first
two seen together. When they left the field the second time,
after the cursing and threats, Goff went one way for Driggers,
and McCarter another way for Underwood. That both were
actuated by the same purpose and with mutual understanding
is evidenced by the fact that Goff and Driggers at one place,
and McCarter and Underwood at another place, were engaged
in the same enterprise of getting together men, guns, and
ammunition for the coming conflict. Their actions, tending
to the same purpose, could not have been accidental, and must
have been understood previous to their separation at the field;
and the presence of McCarter at the field, followed so shortly
by the other circumstances, can only be explained upon the
theory of some kind of an understanding between the two
men existing at that time, and that being the time the threats
were made by Goff, we think the testimony was competent.

The fourth and fifth assignments will be considered later.

The seventh, eleventh, twelfth, thirteenth, fourteenth,
fifteenth, sixteenth, seventeenth, and eighteenth specifications
relate to the refusal of the court to give certain instructions
requested by plaintiff in error. These requests for instructions
were predicated generally upon the idea that the general charge
of the court did not fully and sufficiently instruct the jury as
to the rights of the defendant to protect his realty from the

invasions of those who, by force of arms, should attempt to take possession of it. They also complained that the general charge did not sufficiently explain to the jury the right that the defendant would have to stand, and not retreat, while protecting his realty from an enforced and armed trespass; and also that the court should have, as to the testimony of the accomplice, McCarter, instructed the jury either that McCarter was an accomplice, or should have defined the meaning of the word. They also challenge the correctness of the court's charge as to mutual combat. Relating to the right of the defendant to protect his property, and the force he might lawfully use in doing so, the court charged the jury as follows: "If the defendants, or either of them, used only such means as were apparently necessary to repel the force used by deceased and protect themselves from apparent bodily harm, this they had the right to do, and if, in the exercise of such apparently necessary self-defense, death resulted, then defendant would not be guilty of murder or manslaughter, and should be acquitted. * * * The jury are instructed that justifiable homicide is the killing of a human being in self-defense, or in the defense of habitation, property, or person, against one who manifestly intends or endeavors by violence or surprise to commit a felony on either. A bare fear of any of these offenses is not sufficient to justify the killing. It must appear that the circumstances, viewed from the defendant's standpoint, as they reasonably appear to him, were sufficient to excite the fears of a reasonable man, and that the defendant acted upon these reasonable appearances of danger. * * * You are instructed that a man may use force to defend his real or personal property in his actual possession against one who endeavors to dispossess him without right, taking care that the force used does not exceed what reasonably appears to be necessary for the purpose of defense and prevention. But, in the absence of an attempt to commit a felony, he cannot defend his property, except his

habitation, to the extent of killing the aggressor for the purpose of preventing a trespass, and, if he should do so, he would be guilty of a felonious homicide. Life is too valuable to be sacrificed solely for the protection of property. Rather than slay the aggressor to prevent a mere trespass, where no felony is attempted, he should yield and appeal to the courts for redress. You are instructed that, although you may believe from the evidence that the deceased had rented the lands in controversy and was entitled to the possession thereof, that still he was not justified in driving his cattle thereon or taking possession of the land by force if the same was in the actual possession of the defendant; but the court would instruct you that an attempt of the deceased to drive his cattle on the premises would not of itself be a felony.     *     *     *     If you be icve from the evidence, beyond a reasonable doubt, that the defendant, either by himself or acting with others, armed himself and had others with him who were armed or the purpose of going to the stock field in question and preventing the deceased from driving the cattle into said stock field, and that his purpose in being so armed was to pre, ent an entry into said stock field on the part of the deceased with said cattle, and if you further belie e that it was his purpose and intention in being thus armed and present at said place to make an assault upon and kill the deceased, or otherwise attempt to injure h m with a deadly weapon, if the deceased attempted to drive said cattle into said stock field, and in pursuance of said purpose he did shoot at, and others acting with him did shoot and kill, the deceased, then in such case such act upon the part of the defendant, if the deceased was thereby killed, is murder, although you may believe that the deceased was fired upon and his death ensued thereafter by reason of the fact that he may have attempted to pull down the fence for the purpose of entering the said cattle. If you should believe from the evidence that the defendant, B. F. Driggers, was informed and believed that the deceased

and one Tom Kelley had taken possession of a certain stock field the day previous to the killing, which said stock field was also claimed by the defendant, and that the defendant was informed and believed that the said Kelley and the deceased, or either of them, would be at the field in question on the morning of the killing, and that the man Kelley, or the deceased, had made threats against the life of this defendant, and that the defendant believed that Kelley and the deceased and the others would be at the field in question, having in their possession deadly weapons, as mentioned heretofore, and you further believe that the defendant, knowing all these things, voluntarily organized or assisted in organizing a company of men, arming himself and such men with deadly weapons, guns, and revolvers, loaded, and that such preparation was for the purpose of meeting the said Kelley and the said deceased in deadly conflict, and that the defendant proceeded to the place of the killing with said company and with said arms, and that at such time and place a conflict ensued with deadly weapons, and the deceased was killed, and the defendant participated in the shooting, then such conflict would be what is known in law as a mutual combat. And, if in such combat a party is killed, all parties who knowingly and intentionally engage in the conflict are guilty of murder, and cannot claim the right of self-defense if you so find." Without setting out the numerous requests on these points, we are of the opinion that the charge of the court was a full and fair exposition of the law relating to them. In our judgment everything asked for by these requested instructions which was proper to have been given was covered by the general charge—not in the same language, it is true, but still in language as easy to be understood and embracing the principles of law involved upon this phase of the case as fully and as clearly as those requested

In their supplemental brief counsel for plaintiff in error make a long and ingenious argument on the proposition that

as there was some evidence on the part of the defendant tending to show that deceased, just at the time of the killing, had taken hold of a post of the fence with the apparent intention of pulling it down for the purpose of allowing his cattle to be driven through into the field, and that the willful destruction of a fence is a felony, and, the deceased being armed at the time, that it was, from the standpoint of defendant, the commission of a felony by the deceased by "violence or surprise," and therefore defendant under the statute was justified in the killing, and that the court erred in not giving such an instruction which had been requested, and charging the jury otherwise. Section 1547, Mansf. Dig. [Ind. Ter. Ann. St. 1899, § 890], provides: "Justifiable homicide is the killing of a human being in necessary self-defense or in defense of habitation, person or property against one who manifestly intends or endeavors by violence or surprise, to commit a known felony." Section 1665, Mansf. Dig. [Ind. Ter. Ann. St. 1899, § 1008,] provides: "If any person shall willfully or maliciously burn or otherwise destroy any rail or plank fence, or other inclosure, or any cotton or corn pen, fodder, hay, wheat, or oat stack, or any other valuable improvement, less than a tenement, shall be guilty of a felony," etc. It is argued that, as there was some proof that the fence belonged to defendant and that the deceased was attempting to pull it down, under section 1665, supra, he was committing a felony; and, as the proof showed that the deceased was armed and was using violence in pulling the fence down, he might lawfully be killed in defense of property under section 1547, supra. Section 1665 declares that the willful or malicious burning or otherwise destroying of the fence of another shall be a felony. Certainly the statute never contemplated that the mere pulling down the panel of a fence for a different purpose than its destruction should be a felony, and more especially when it was done, as in this case, by a party under claim of title. The defendant knew the conditions. He knew that

the deceased was claiming the land under a lease, and cannot now be heard to claim that looking at it from his standpoint he believed that the deceased was with violence and surprise committing a felony on his property.   Nor does he in his testimony anywhere set up such a claim.   He testifies that he raised the crowd and procured the guns and ammunition the night before for the purpose of ' keeping deceased from turning the cattle in the field," and he took his arms with him because he "thought an enemy would be with the deceased's crowd, and he wanted his gun to protect his life; that, when deceased threw his hand to the post as if to pull down the fence, he also threw the other hand to his pistol to draw it, and defendant shot him to save his life"—and thus, as far as his testimony is concerned, putting his defense squarely on the ground of necessary defense to his person, upon which issue the court fully and fairly charged the jury.   If it be absolutely true that the deceased as claimed by the defendant, threw his hands on the post for the express purpose of pulling down the fence to make a gap through which he might drive his cattle into the field, the act was not felonious within the meaning of the statute.   Taking the testimony of defendant to be true on this point, the act was not more than a mere trespass, and gave no justification for the killing, and therefore the court did not err in refusing those requested instructions based upon the theory that the deceased was with "violence or surprise committing a known felony on the property of the defendant."

In the course of the charge on the right of self-defense, the court said, among other things: "Before the defendant can justify the killing of the deceased, if you believe from the evidence beyond a reasonable doubt that the defendants, or either of them, did kill him upon the ground of self-defense, it must appear that the danger was so urgent and pressing, or apparently so urgent and pressing, that, in order to save his own life or to prevent his receiving great bodily harm, such

killing was ab olutely necessary, and it must also appear that the deceased was the assailant, or that the defendant had really in good faith sought to avoid a difficulty before the fatal wound was given." The only objection to this part of the charge is in the use of the word "absolutely." No objection was made or exception saved to it, or to any part of the charge relating to self-defense at the trial; and therefore the question is not now before us. We have, however, carefully examined the charge, and think that upon the question of self-defense on the whole the law was properly given. The court charged the jury that: "You are instructed that the law is if a person is assaulted in such a way as to induce in him a reasonable belief that he is in actual danger of losing his life, or of suffering great bodily harm, he will be justified in defending himself, although the danger be not real, but only apparent. Such person will not be held responsible criminally if he acts in self-defense from real and honest convictions as to the character of the danger, induced by reasonable evidence, although he may be mistaken as to the extent of the actual danger. A person need not be in actual imminent danger of his life or of great bodily harm before he may slay assailant. It is sufficient if in good faith he has a reasonable belief from the facts as they appear to him at the time that he is in such imminent peril. If the jury believe from the evidence that at the time the said defendants are alleged to have shot the deceased the circumstances surrounding the defendants were such as in sound reason would justify or induce in the mind of the defendant on trial an honest belief that he was in danger of receiving from the deceased some great bodily harm, and that the defendants in doing what they then did acted from the instinct of self-preservation, then the defendant on trial is not guilty, although there may in fact have been no real or actual danger."

The eighth assignment of error complains of the charge of the court relating to the necessity for corroborating testimony

of an accomplice before conviction can be had. The defendant requested the following instruction: "You are instructed that Tom McCarter, the witness introduced by the government, is an accomplice in the offense charged against the defendant, and a conviction cannot be had upon his testimony, unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows that an offense was committed and the circumstances thereof." The charge of the court was as follows: "Under he laws of Arkansas (section 1602, Ind. Ter. Ann. St. 1899), it is provided as follows: 'A conviction cannot be had in any case of felony upon the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof.'" An exception was saved to the refusal of the court to give the requested instruction, but none saved as to the charge given. The only difference between them is that in the requested instruction the court is asked to charge the jury that Tom McCarter was an accomplice, while the instruction given left that question to the jury. Whether McCarter was an accomplice or not was a question of fact, to be determined by the jury. "The court is not required to affirmatively charge that a witness is an accomplice. Where he is admitted to be such, or the facts place this beyond dispute, the court may so charge, without invading the rule that charges should not be upon the weight of the evidence. Whether or not a witness is an accomplice is a question of fact, and the charge may be so framed as to submit this as an issue to the jury. It was not necessary in this case to instruct the jury that Anderson was an accomplice." Dill vs State (Tex. Cr. App.) 28 S. W. 950. "It is urged that it was plain from the testimony of the witness Kelley that he was an accomplice of the defendant if defendant committed

the crime alleged, and the court should have so instructed the jury; but the court fully and carefully instructed as to the weight and effect of the testimony of an accomplice, and to have gone further and told them that Kelley was an accomplice would have been clearly a charge with respect to matters of fact, which is not allowed." People vs Sansome, 98 Cal. 235, 33 Pac. 204. See, also, Spears vs State, 24 Tex. App. 537, 7 S. W. 245 If the plaintiff in error regarded the word "accomplice" as a technical, legal one, requiring at the hands of the court a definition, he should have requested it, and not by asking a declaration on the part of the court that McCarter was an accomplice, for this would be a finding of fact from the proof. And this was the effect of the requested instruction. "While in one sense it is undoubtedly the duty of the judge to give instructions to the jury covering the entire law of the case, as respects all the facts proved or claimed by the respective counsel to be proved, still, if he omits something and is not asked to supply the defect, the party who remained voluntarily silent cannot complain." 1 Bishop, Cr. Proc. § 98; Carroll vs State, 45 Ark. 548   The court followed the language of the statute, and in this case it was amply sufficient, and there was no error in refusing the requested instruction.

After the jury had retired and had been out for some considerable time they returned into court, and propo nded the following written question: "Your honor, does the charge of what is known as 'mutual combat' cut out the right of self-defense?" Whereupon the court repeated the charge as to mutual combat, as heretofore set out in this opinion, and added the words, "and cannot claim the right of self-defense if you so find." Thereupon the defendant's counsel asked the court to give three other additional instructions, the first as to the rights of the parties after the defendant may have abandoned the fight in a mutual combat; second on the question of the burden of proof; and third: "That the mere fact that the

defendant may have been willing to fight the deceased would not deprive him of the right of self-defense. In order to take away the right of the defendant to defend himself, he must have been willing to fight on account of ill will toward the deceased." These instructions were all refused, and properly so, because they do not correctly state the law of the case. As to the first, there was no evidence of the fact that defendant had, after the beginning of the difficulty, abandoned the fight. As to the second, the court had fully given the law as to the burden of proof. As to the third, it is not the law under any conditions in a killing in mutual combat. Ill will is not the only element of malice which would make it murder. Any other unlawful cause or motive inducing a fight, such as a deadly conflict over the possession of property, a mutual deadly conflict for the hand of a lady, or any other cause where the intent to kill exists, and a killing occurred, would be malicious killing, and therefore murder. We think the court's charge on the law of mutual combat was correct, and that the requested instructions were properly refused.

The fourth assignment of error is as follows: "Fourth. The court erred in permitting the government over the objections of the defendant, to prove by the witness Rhea that on the day after the difficulty he had a conversation with the government witness Tom Kelley, in which Kelley told him that at the time of the difficulty that Brady got down off his horse and pulled his saddle up, and as he turned his head the shooting commenced; that Kelley did not tell witness in that conversation that Brady took hold of the fence post, nor did he say anything about the fence." Kelley had been put upon the stand by the government and had testified in effect, that he was present at the killing, and at the time of the shooting by the defendant the deceased did not have his hand upon the post of the fence. While on the stand, and for the purpose of impeaching the witness by showing that at another time he had made a different

statement in relation to the matter, he was asked if he did not upon the evening of the day of the killing and at a certain place, in relating the circumstances of the killing, say to one W. M. Boatright, a witness for the defendant, that "Brady, the deceased, got from his horse and took hold of the post at the time he was shot." This being denied, Boatright was placed on the stand, and stated that Kelley had at the time and place mentioned made such a statement—that is, that the deceased, when he got from his horse, had taken hold of the post. For the purpose of corroborating Kelley, Rhea was placed on the stand by the government in rebuttal, and testified that the day after the killing he heard Kelley relate the circumstances of the killing to about the same effect as stated by Kelley on the stand; that he said nothing about the taking hold of the post, etc. This was objected to by defendant, the objection overruled, and exception saved. The statement made by Kelley to Boatright was on the evening of the killing. That made to Rhea was the day after, excluding the idea that Kelley's story on the stand, if false, was a recent fabrication, and there was no intimation that he testified under corrupt motives. Mr. Wharton, in his work on Criminal Evidence (section 492), says: "It is ordinarily incompetent to sustain him by proof that on other occasions his statements were in harmony with those made on the trial. On the other hand, where the opposing case is that the witness testified under corrupt motives, or where the impeaching evidence goes to charge the witness with a recent fabrication of his testimony, it is but proper that such evidence should be rebutted." We think the court erred in admitting the evidence of Rhea. But was this prejudicial error? The point in controversy was: Did the deceased at the time he was shot lay his hand on the post? And, if Kelley's testimony was contradicted, it was only on this point. We have already pointed out that the tearing down of the fence under the circumstances was not a felony, and that act did not justify defendant in

shooting and killing Brady; and therefore, if he were killed because of that. it was murder, and, if he were not killed because of that, it was immaterial. At the trial the defendant, hoping that the court would hold that the attempted tearing down of the fence was the commission of a felony with violence justifying the killing of deceased, was making an effort to prove that fact. The defendant testified to it. It was a dangerous ground to take, for, if the court should hold that it was not a felony and did not justify the killing, then all proof tending to show that the deceased was engaged in that act, together with one of the defendant's defenses justifying on that ground, would tend to prove a case of murder. The government at the trial, fearing that the court would hold the act of the attempted tearing down of the fence to be a felony done with violence and therefore the killing justifiable, undertook to. prove that the deceased was not at the time of the killing attempting to pull down the fence. But the court, very properly as we hold, held that conceding that deceased was tearing down the fence it was no felony, and did not justify the killing; and so it turned out that all of the testimony offered by defendant tending to show that Brady was killed by defendant because of that fact tended to prove murder, and therefore was against the defendant, and all of the testimony of the government, including that of Kelley and Rhea, tending to show that deceased did not lay his hand on the post and therefore was not killed because of that fact, tended to prove on that point the innocence of defendant, and therefore the testimony of Rhea, improperly admitted though it was, tending to corroborate and support the testimony of Kelley that the killing was not done because of this motive. which would make it murder . was favorable to the defendant, and therefore the error was not prejudicial to him.

The fifth assignment of errors relates to the admissibility of the testimony of one Jim Saddler. Saddler is dead, and his

testimony was reduced to writing by the commissioner before whom the examining trial was had, and his testimony was read at the trial. The only question raised by this specification is as to whether the death of Saddler had been sufficiently and legally proven. The first testimony offered as to his death was the return of the officer upon the subpoena, which was that the witness was dead. The contention of defendant as to this proof is that the return does not show what effort the Marshal made to serve the subpoena, nor does it show how he got his information that the party was dead, or upon what facts he based his return. It is also contended that the return of the officer is no evidence of the fact of Saddler's death. Upon this last point he submits no authorities. "It is the duty of the sheriff to return all process to the proper court, whether executed or not." Brown vs Baker, 9 Port. (Ala.) 503. "The diligence used to obtain service on a defendant is not required to be stated in the officer's return." Neally vs Redman, 5 Iowa, 387. "If the party named in a writ cannot be served, the officer should state the reasons." 18 Enc. Pl. & Pr. p. 944. "When a party is dead, the return should be mortuus est, and not nihil habet." Burr vs Dougherty, 14 Phila. (Pa.) 6; 18 Enc. Pl. & Pr. 944. And the return of the officer is prima facie evidence of the facts stated, and, "though the facts may not have been within the personal knowledge of the officer, the return is not for this reason deprived of its force as prima facie evidence of such facts, for even in this case, in absence of impeaching testimony, the return is sufficient evidence of the facts certified." 18 Enc. Pl. & Pr. p. 978, and authorities cited. In this case the return of the officer was in proper form, certifying to the fact of the witness' death, and this alone established, prima facie, that fact; and, as there was no evidence to impeach the return, the court did not err in admitting the testimony of the dead witness, who, previous to his death, had testified in the same case before the commissioner, in the presence of defendant and

subject to his cross-examination. The fact that other witnesses testified at the trial that they had heard that the witness was dead, if their testimony were hearsay or incompetent, which at best is doubtful, does not affect the matter, because a prima facie case had been made without it. The evidence was directed to the court, and not to the jury, and, had the court sustained the objection, the result would have been the same. Had the hearsay proof been eliminated, the prima facie case on the point of the admission of the testimony of the dead witness, made by the return of the officer, would still have stood, and would have been sufficient.

On the whole case, we are of the opinion that there was no error prejudicial to defendant committed by the court; and therefore the judgment of the court below is affirmed.

GILL, C. J., and LAWRENCE, J., concur; TOWNSEND, J., not participating.