## JEAN HAVILL v. UNITED STATES.

### No. A-65.   Opinion Filed April 10, 1911.

#### (115 Pac. 119.)

1. **APPEAL—Review—Discretion of Court—Suspension of Trial.** During the progress of a trial for murder, the court over the objection of the defendant suspended the trial for several hours in order to enable the state to procure the attendance of absent witnesses. Held, that this proceeding was within the sound discretion of the court, and such order of the court will not be reviewed unless an abuse of discretion appears.

2. **FORMER JEOPARDY—Suspension of Trial.** Upon resuming the trial the defendant interposed a plea of former jeopardy. Held, that said plea was without merit, and was properly overruled.

3. **APPEAL—Harmless Error—Failure to Furnish List of Witnesses.** The right of a defendant indicted for a capital offense alleged to have been committed in the Indian Territory prior to statehood to have delivered to him under section 1033, Sts. Ann. vol. 2, p. 344 (U. S. Comp. St. 1901, p. 722), at least two days before the trial a list of the witnesses to be produced, is not violated to the extent of constituting reversible error where the testimony of the witness was cumulative, and offered for the sole purpose of fixing the time and place of the victim's death.

4. **MURDER—Manslaughter—Venue—Death Outside of State.** Murder or manslaughter is committed within the Central district of the Indian Territory if the felonious act is committed there, although the death occurs in the state of Texas.

(Syllabus by the Court.)

*Appeal from District Court, McCurtain County; D. A. Richardson, Judge.*

Jean Havill was convicted of manslaughter, and he appeals. Affirmed.

Plaintiff in error, Jean Havill, was indicted in the United States court for the Central district of the Indian Territory at the September term, 1907. The indictment charged that the defendant on the 28th day of August, 1907, within said district, shot and killed one Joe Christopher. Upon a trial in the district court of McCurtain county, to which court the case was transferred after statehood, the jury by their verdict found the defendant guilty of manslaughter, and assessed his punishment at imprisonment for a period of one year and a fine of $50. The judgment and sentence was rendered and entered on October 3, 1908, from which judgment an appeal was perfected by filing in this court on January 7, 1909, a petition in error with case-made attached. The appeal was dismissed for failure to file proof of service of notices of appeal. 113 Pac. 991. This dismissal is set aside for the reason that the records of the clerk of this court show that proof of service was filed within the time in which the appeal could be perfected.

The evidence on the part of the state is in substance as follows:

Dr. L. M. Ellis testified that he was a physician and surgeon practicing at Millerton; that he was called to see Joe Christopher on the evening of the 28th day of August, 1907, and found him suffering from a gunshot wound, the ball having entered on the side at the juncture of the seventh and eighth ribs, and passing through the body; that he saw Mr. Christopher the last time two days later; that he was in a very serious condition; that the wound was necessarily fatal. He further testified as follows:

"Q. Do you know what the result of that wound was? A. Yes; it produced septic peritonitis. Q. What was the final result of that wound? A. Death."

Recalled, he testified as follows:

"Q. State to the jury what that conversation was? A. He came in and wanted to borrow a gun from me. I asked him what he

wanted with it, and he told me to shoot Joe Christopher. Q. State as near as you can how long that was before the shooting took place. A. It was about half or three quarters of an hour. Q. He stated to you that he wanted the gun to kill Joe Christopher. with? A. He said to 'shoot' him."

D. Holden testified that he was a general merchant, his place of business joining that of Joe Christopher. He further testified as follows:

"A. I was standing in my front door, and Mr. Christopher had placed some fishing poles nearly in front of my door. He was preparing to go fishing, and his little boy, eight, nine, or ten years old, was standing near his father's door, playing, when little Sally Havill, about eight or nine years old came along. She was playing, and in some way struck at Mr. Christopher's little boy, and he grabbed her and said that he was going to kiss her, and it made her mad, and she went off crying. Mr. Christopher made the little boy quit. In a short time after, 20, 30, or 40 minutes after, Jean Havill came down. I was standing in my front door, and he told Mr. Christopher that he had come down to whip his boy. He said that Joe Christopher would have to whip his boy, or he himself would do it. Christopher asked him why, and he said the way the boy had treated his little sister, and Mr. Christopher told him that he had made the boy stop and let her alone, and so on. Jean persisted in Christopher whipping the boy, and was swearing. Finally Joe told him to leave his place of business, and Jean said he did not have to go, still swearing. It seems to me that Joe went up to him as if to lead him off, that was what I thought, but I do not know what he meant to do, and my recollection is that Jean struck at him. When he did this, Joe grabbed him by the shoulders, or some way, and shoved him down against the sidewalk. He shook him that way, and then let him up. When he got up, he said, 'Christopher, you are a man, and too much for me, but I'll do you, I'll kill you for that.' "

He further testified that the deceased was about 35 years old and would weigh about 150 or 160 pounds.

Ben Miller, Jr., testified that about 6:30 he was walking home on the street that defendant lived on; that as he was passing a shot was fired. He further testified as follows:

"Q. Who fired the first shot? A. I could not say. Q. I'll ask you if Mr. Christopher fired that shot? A. No; he did not fire that shot. Q. You may proceed. A. When the first shot was fired, I think I walked down the street and remarked to Mr. Havill, the boy's father, to try and stop the trouble or some one would get hurt. Of course, at that time I was in the center of the street, and about that time some more shots were fired, and that is about all I could say about it. Q. Do you know who fired those shots after that? A. Well, I saw one shot fired after that. Q. Who fired that shot? A. Jean Havill. Q. Where was he at the time he fired that shot? A. At the corner of the house, as near as I can remember."

W. R. Jones testified:

"Q. I will ask you if you saw Jean Havill prior to the time the first shot was fired? A. Yes, sir. Q. What was he doing? A. He was in his yard. Q. State to the jury where Jean went, if anywhere, before the first shot was fired. A. Well, I was standing in my home, and Christopher was sitting on his front steps, with his hand up here like this, in his breast, and his little boy came up the street, and Mr. Havill or Mrs. Havill said something to him. I did not understand what it was. Christopher jumped up and said, 'If you have anything to say to him, say it to me,' and went up to the fence, and talked, but I could not hear what was said. Jean was over in his yard and he came running to the gate with a pistol in his hand behind him, in his right hand, and stood there a little bit and listened to them, and the first thing I knew he had drawn and shot. Q. I'll ask you if Jean made any effort to borrow a pistol from you that evening. A. Yes. Q. Did he state what he wanted it for? A. No; he did not. He came over to my house late in the evening, and told me of the rucus he had had on the street, and asked me if I had a pistol. I told him I did, and he asked me to loan it to him, and I said no."

Cooper Watkins testified that he lived right across the street from the defendant and the deceased; that he came out of his house and started down town and walked 10 or 15 steps, turned around, and looked back; that "just as I looked back, Jean stepped to the fence, threw up his gun, and shot twice." He further testified as follows:

"Q. Had any other pistol been fired prior to that? A. No. Q.

Did you see Mr. Christopher at that time? A. Yes. Q. State what you saw Mr. Christopher doing, if anything. A. When Jean fired, he jumped back and jerked his gun from his bosom, and Jean ran inside his yard. He was about half way from the gate to the house, and Christopher shot twice. He ran around the house, and Christopher started outside the gate, and just as he got outside the gate Jean shot him again. Q. Was that all the shots that were fired by Christopher? A. Yes. Q. He fired two shots after Jean Havill had fired two shots at him? A. Yes. Q. Did he have his gun in his hand at the time Jean Havill fired the first two shots? A. No; I do not think that he did. He jumped back and jerked his gun from his bosom. Q. You saw him jerk his gun from his bosom after the first two shots were fired. A. Yes, sir. Q. You are positive that Jean Havill fired two shots before Christopher fired any? A. Yes, sir."

Phillip Johnson testified that he was associated with Joe Christopher in business at the time of his death; and further testified as follows:

"Q. State to the jury what part of the shooting you saw? A. I saw one shot fired by Havill. Q. Where was Havill at the time this shot was fired? A. Behind the corner of the house he lived in. Q. Can you state where Christopher was? A. He had either come out of the gate or was going out. Q. In doing so, was he going towards Havill or going away from him? A. Going away from him. Q. After that difficulty did you have a conversation with Jean Havill? A. I did. Q. Was that conversation between you and Jean Havill prior to the shooting? A. Yes. Q. What was that conversation? A. He wanted to borrow a gun from me. Q. Did he state why he wanted the gun? A. Yes. Q. What did he say he wanted the gun for? A. He said he wanted it to shoot Joe Christopher with."

His cross-examination showed that he owned the gun that Christopher had at the time the shooting took place.

Mrs. Lucy E. Foreman testified, in part, as follows:

"Q. Did you live neighbor to Mr. Christopher and Mr. Havill? A. Yes, sir. I lived just across the street from them. Q. I'll ask you if you saw any part of the shooting scrape between them on the 28th day of August? A. I did. Q. In your own way please state just what you saw, and not what has been told you. A. I went to the door that evening to see where the children were and heard a racket— Q. What kind of a racket?

A. Talking and it looked like my children were down among them. In a few minutes I saw Jean go in the house. He came out in a minute or two, and then directly fired the shot. Q. Did you see Jean's pistol before he fired? A. Yes. Q. Can you state how close he was to Mr. Christopher when he fired? A. I cannot say exactly. Q. Can you estimate it? A. I cannot say how close it was, probably about ten feet. Q. I will ask you if your attention was directed to both Mr. Havill and Mr. Christopher at this particular time? A. Yes; I think it was. Q. I will ask you if you noticed the position of Mr. Christopher's hands at that time? A. Mr. Christopher was standing at the fence, with one hand on the fence, and the other hand by his side. Q. What time did you see his hands in that position? A. That was before the shooting. Q. At the time the first shot was fired did you see the position his hands were in? A. Yes; that was like I said. Q. Can you state of your own knowledge who fired the first and second shots? A. I guess Jean fired the first and second shots. Q. Do you know who fired the two next shots? A. Yes; Mr. Christopher."

Here the record shows the following proceedings were had:

"The State: It will be impossible for the state to proceed further in the trial of this case until the arrival of the train from Hugo this afternoon. The train gets here at 4:53, and we cannot proceed further until the arrival of the witness on that train.

"The Defendant: The defendant being in court, we move the court that the trial of this case proceed.

"The Court: I'll overrule the objection.

"The Defendant: We except.

"The Defendant: We now move the court that the defendant be discharged, there not having been offered any evidence sufficient to convict him, or to hold him further on this charge.

"The Court: The motion will be overruled.

"The Defendant: We except.

"The Defendant: We now move the court to instruct the jury to return a verdict of not guilty against this defendant on account of insufficient evidence to convict him.

"The Court: The court holds that it has power to suspend further proceedings in the trial for a reasonable time to enable absent witnesses, whether subpœnaed or not, to attend the trial and give their evidence, and the court overrules the motion and the request of the defendant, and will defer further proceedings

in the trial for a reasonable time to await the arrival of the witnesses.

"The Defendant: We except.

"The Court: Let the record show that the jury during this time were not allowed to separate, but were kept in charge of their sworn bailiff, and were duly admonished not to talk about the case among themselves, or to allow others to do so in their presence."

Before the taking of testimony was resumed on the same day the defendant filed a plea of former jeopardy, which plea was overruled by the court, and B. F. Christopher, a witness for the prosecution, being duly sworn, testified as follows:

"Q. Please state your name? A. B. F. Christopher. Q. What is your age? A. 43 years. Q. Where do you live? A. At Cuthand, Texas, in Red River county.

"Defendant: The defendant objects to any question that may be asked the witness on the ground that this case was suspended without the consent of the defendant, and, being resumed again, is a violation of his rights, and is placing him on trial twice before a jury for the same offense. Defendant objects on the further ground that he was not two entire days before the trial of this cause furnished with a list of the witnesses to be used by the prosecution in chief, showing the name and residence of the witness B. F. Christopher.

"The Court: Let the record so show. I'll overrule your objection. "Defendant: We except.

"Q. Are you acquainted with Jean Havill? A. I know him when I see him. I have seen him a few times. Q. You were acquainted with Joe Christopher? A. Yes; he was my brother, younger than me. Q. Where is Joe now? A. He is dead. Q. Do you know that of your own personal knowledge? A. Yes; I seen him after he was dead. I seen him in the undertaker's office, and I looked at him at the grave where he was buried. Q. Do you know the cause of his death? A. Only that I saw he was shot. Q. How long did he live after he was shot? A. I was not there when he was shot. From the time I learned that he was shot he lived about 7 days, about 6½ days. Q. Do you know where he died? A. I know it was in a hospital, but I have forgotten the name of it. It was in Paris, Tex. He was under the care of Dr. Hook. Q. In Paris, Tex., or Paris, Okla.? A. Paris, Tex."

The evidence on the part of the defendant is in substance as follows:·

J. W. Guest testified that he was present when the fist fight occurred; did not hear the defendant make any threats that he would kill the deceased; that this was at least an hour before the shooting took place.

Doc. Guest testified that he saw the fist fight about 5 o'clock as he was driving by with a load of logs; that about 15 minutes later he met Mr. Christopher, and heard him say that, "I am going to get a Havill or two before supper; that he went from there to the post office, and 20 minutes later met the defendant, and told him what Mr. Christopher had said; that just before the shooting he saw the parents of the defendant standing in their yard, and the deceased was coming from his door towards the fence that divides their dooryards and that his hand was in his bosom; that defendant came out of the door of his home where Mr. Christopher and his father was talking, and that the deceased pulled a gun from his bosom and they both shot; that he did not know who fired the first shot; that Mr. Christopher fired the first shot at the elder Havill and the second shot at the defendant, and then walked out in the middle of the street and fell down.

Mrs. Ollie Robb testified that she witnessed the shooting, but could not say who fired the first shot; that the defendant was at her house a few minutes before with a pistol in his hand; and that she did not see a pistol in Mr. Christopher's hand before the first shot was fired.

H. E. Robb testified that the first two shots were fired by the defendant and the deceased, but he could not say who fired the first shot.

John Havill, father of the defendant, testified that the first shots were fired by the deceased and the defendant almost together; that he and Mr. Christopher had no former trouble.

Mrs. Havill, the mother of the defendant, testified that the first two shots were together.

The defendant testified: That he went down to Mr. Christopher's place, and said to him, "'You ought to make your boy behave himself, and make him stop annoying my sister. If you cannot tend to him, I will have to do so.' He ordered me away, ordered me to get off his sidewalk. I told him I would not go; that it was a public place; that I had a right to be there. Christopher hit me, and we mixed up and Christopher threw me down and bumped my head on the sidewalk, and he let me up and wanted me to go away. I repeated that I would not go, and I hit him again, and he hit me, then he wanted me to go away, and I would not." That he then went home and met Doc. Guest. That Doc. Guest said that Mr. Christopher had made some threats about killing a couple of Havills. That he then went to Foreman's, and asked Mr. and Mrs. Foreman for a gun. They said "No." Then went to W. J. Jones, and then to Dr. Ellis, and tried to get a gun. Then went to the sleeping shack and got Jule Hall's gun, a 38 caliber. That he came out of the house and saw Mr. Christopher with his hand in his breast, talking to his father. That he did not understand what he was saying. That Mr. Christopher pulled his gun out in the direction of his father and shot. He was then asked: "Q. Who shot first, you or he? A. I cannot tell you. We both shot at the same time. When I saw him draw his gun I fired." He also testified that he shot two times at Joe Christopher in defense of his father and in self-defense, and that the third shot was accidental.

*Foster & Stephenson,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen., for the State.

DOYLE, JUDGE (after stating the facts as above). Counsel for plaintiff in error in their brief state:

"We have elected to reserve only two propositions for the consideration of this court. They may be thus stated: The defendant having been placed upon his trial in a court of competent jurisdiction, before a jury regularly drawn, impaneled, and sworn, and the trial of his case begun, he was entitled to have the trial

proceed, and that upon the failure of the state to prove a case against him he then and there became entitled to his discharge, and, this right having been once acquired, he was entitled to the benefits of the provisions of the Constitution of the United States and the Constitution of the state of Oklahoma against being twice put in jeopardy for the same offense; and (2), the name and address of the witness, B. F. Christopher not appearing upon the list of witnesses served upon the defendant prior to the trial, the resumption of the trial by the examination of said witness was erroneous."

In support of the first contention counsel cite the following authorities: *State v. Nelson*, 19 R. I. 467, 34 Atl. 990, 33 L. R. A. 559, 61 Am. St. Rep. 780; *State v. Richardson*, 47 S. C. 166, 25 S. E. 220, 35 L. R. A. 238; *McCauley v. State*, 26 Ala. 135. In these cases the jury was discharged during the trial over the objection of the defendant and a new trial ordered. Therefore the doctrine of these cases has no application to the case at bar. It is within the sound discretion of the trial court to postpone the further taking of testimony on account of the absence of witnesses who are expected to arrive that day on a certain train, and this discretion will not be controlled by this court unless abused. In the case of *Johnson v. State*, 32 Ark. 309, it was said:

"After the state had examined several witnesses, the court against the objection of the defendant suspended the trial, and allowed the jury to separate from Tuesday until Friday, that the state might procure the attendance of a witness. The suspension of the proceedings in a trial is within the sound discretion of a court, and we are not prepared to say there was any abuse of its discretion in this case."

See, also, *Griffin v. State*, 90 Ala. 596, 8 South. 670.

The contention that defendant was twice put in jeopardy for the same offense is without merit. As we view the record, there was not the semblance of error in the rulings of the trial court.

In support of their second proposition, counsel cite the case of *Logan v. United States*, 144 U. S. 263, 12 Sup. Ct. 617, 36 L. Ed. 433. In the case of *Hickory v. U. S.*, 151 U. S. 303, 14 Sup. Ct. 334, 28 L. Ed. 170, Mr. Chief Justice Fuller said:

"Under section 1033 of Rev. Stat. (section 1033, vol 2, Fed. Sts. Ann. p. 344 [U. S. Comp. St. 1901, p. 722]), any person indicted of a capital offense has the right to have delivered to him, at least two days before the trial, a list of the witnesses to be produced, and it would be error to put him on trial and allow witnesses to testify against him whose names have not been furnished, if he seasonably asserted his right. *Logan v. United States,* 144 U. S. 263 [12 Sup. Ct. 617, 36 L. Ed. 433]. But we think he did not do that here, and that the defect was waived. It was suggested by counsel for the defendant that the objection was made as soon as it was discovered that notice had not been given in respect to this witness; but we are of opinion that the discretion of the trial court was properly exercised upon the question."

In the case of *Thiede v. Utah Territory,* 159 U. S. 510, 16 Sup. Ct. 62, 40 L. Ed. 237, Mr. Justice Brewer said:

"But this section applies to the Circuit and District Courts of the United States, and does not control the practice and procedure of the courts of Utah, which are regulated by the statutes of that territory. This question was fully considered in *Hornbuckle v. Toombs,* 18 Wall. 648 [21 L. Ed. 966], and it was held, overruling prior decisions, that the pleadings and procedure of territorial courts, as well as their respective jurisdictions, were intended by Congress to be left to the legislative action of the territorial assemblies and to the regulations which might be adopted by the courts themselves. See, also, *Clinton v. Englebrecht,* 13 Wall. 434 [20 L. Ed. 659], in which it was held that the selection of jurors in territorial courts was to be made in conformity to the territorial statutes; *Good v. Martin,* 95 U. S. 90 [24 L. Ed. 341], in which a like ruling was made as to the competency of witnesses; *Reynolds v. United States,* 98 U. S. 145 [25 L. Ed. 244], where the same rule was applied to the impaneling of grand jurors and the number of jurors; also *Miles v. United States,* 103 U. S. 304 [26 L. Ed. 481], a case coming from the territory of Utah, in which the same doctrine was announced with regard to the mode of challenging petit jurors. *Page v. Burnstine,* 102 U. S. 664, 668 [26 L. Ed. 268]. Referring, therefore, to the territorial statutes, there is none which directs that a list of the witnesses be furnished to the defendant. Section 4925, Comp. Laws Utah, requires that the names of witnesses examined before the grand jury be indorsed on the indictment before it is presented.

There is no pretense that this direction was not complied with. In the absence of some statutory provision, there is no irregularity in calling a witness whose name does not appear on the back of the indictment, or has not been furnished to the defendant before the trial. The action of counsel for defendant in asking that as a favor the names be furnished them indicates their understanding of the extent of defendant's right, and, so far as appears, the district attorney fully complied with this request, and furnished the names as fast as he was advised that they would be called. There is no suggestion that the defendant was surprised by the calling of any witness or the testimony that he gave. This allegation of error, therefore, is without foundation."

"While the Revised Statutes of the United States, and not the Arkansas law, were in force in the Indian Territory in so far as the definition of the crimes of murder and manslaughter and the punishment prescribed therefor were concerned, yet the Arkansas law respecting the procedure governing the trial even of those offenses was in force in the Indian Territory to the exclusion of all other laws. *Binyon v. U. S.,* 4 Ind. Ter. 542; *Simon et al. v. U. S.,* 4 Ind. Ter. 688; *Driggers v. U. S.,* 7 Ind. Ter. 752, 104 S. W. 1166; *Taylor v. U. S.,* 6 Ind. Ter. 350, 98 S. W. 123; *Leftridge v. U. S.,* 6 Ind. Ter. 305, 97 S. W. 1018." (*Prince v. U. S.,* 3 Okla. Cr. 700, 109 Pac. 241.)

We believe that the admission of the testimony of the witness Christopher was not error. The plaintiff in error could not be prejudiced by the testimony of this witness. His defense was justifiable homicide in self-defense, and the proof of the *corpus delicti* was sufficient without the evidence of this witness. The proposition advanced by counsel that, if error is shown by the record, the conviction must be reversed, whether such error operated to the prejudice of the plaintiff in error or not, is not the law. In numerous cases determined by this court, the contrary doctrine is announced. The criminal laws of this state must be enforced; and, if it is not already understood, it is high time it should be, that where a case is clearly made out against the accused, and the jury have so found, this court will not reverse a conviction for a mere technical error which it can see could not have affected the result.

Absolute correctness of proceeding cannot be attained, even in our very best courts; and the establishment of any other rule would render the enforcement of the criminal laws practically inoperative.

As we view the record, there is nothing of merit in either of the propositions relied upon to reverse the judgment. What has been said fully disposes of the assignments of error argued. However, it appears that plaintiff in error shot the deceased on August 28, 1907, at Millerton, in the Central district of the Indian Territory, and the deceased six or seven days later died in Paris, Tex., of the mortal wound caused by that shooting. It is for his acts that plaintiff in error is responsible. They constitute his offense. The place where they are committed must be the place where his offense is committed. In contemplation of law, the crime was committed in the Central district of the Indian Territory where he was indicted. The anarchist Guiteau shot President Garfield in the District of Columbia. The president was conveyed outside of that jurisdiction, and died in New Jersey. His assassin was tried, convicted, and executed in the District of Columbia. *United States v. Guiteau*, 1 Mackey (D. C.) 498, 47 Am. Rep. 247. We are of opinion that plaintiff in error has had an eminently fair and impartial trial. The verdict returned by the jury confirms this conclusion. Manifestly the jury was very lenient. Any one accustomed to weighing evidence cannot read the record without being fully impressed with the conviction that this is not a case of justifiable homicide. On the facts which are either admitted, or so clearly established as to be beyond controversy, the plaintiff in error is at least guilty of manslaughter.

For the reasons stated, the judgment of the district court of McCurtain county is affirmed, and the district court is directed and ordered to enforce its judgment herein.

FURMAN, PRESIDING JUDGE, and ARMSTRONG, JUDGE, concur.