W. A. BOLING, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12724.

Court of Criminal Appeals of Oklahoma.

May 20, 1959.

Rehearing Denied July 22, 1959.

Alvin C. Bruce, Ardmore, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

NIX, Judge.

W. A. Boling, plaintiff in error, hereinafter referred to as the defendant, was charged by information in the District Court of Carter County with the crime of murder. He was tried before a jury, found guilty and his punishment assessed at life in the state penitentiary.

The defendant lodged his appeal in this court in due time advancing four assignments of error:

1. That the court erred in overruling defendant's demurrer to the state's evidence and the motion for an instructed verdict.

2. That the court erred in permitting pictures of deceased to be admitted in evidence.

3. That the court erred in refusing to admit defendant's exhibit 1 which was a certified copy of a judgment and sentence wherein deceased had been committed to the state penitentiary.

4. That the judgment and sentence of the court was cruel, harsh, excessive, and unreasonable.

The record has been thoroughly read and a careful study of the testimony has been made in considering the first assignment of error. The court is of the opinion that the trial judge properly overruled defendant's demurrer to the evidence, as well as his request for a directed verdict.

The testimony reflects a tragedy arising out of a bay rum drinking spree, involving the defendant, the deceased, and three other people.

Gilbert Porter, the chief witness for the state, said that the deceased, Jess Yearby, and Willie B. Porter, his brother met the defendant and Callie Thompson, a woman with whom defendant was living, on the road to town and were invited to go gather pecans. They got in defendant's car and drove into the country, gathered some pecans, returned to town, sold the pecans, bought two bottles of bay rum and returned to the country, gathered more pecans, sold them and bought more bay

rum and returned to defendant's home to drink. During the course of the evening, defendant Boling and Jess Yearby became involved in an argument over the division of the profits obtained from the sale of pecans. Yearby, being almost deaf, made it difficult to explain that the proceeds had been consumed in the purchase of bay rum, and finally the defendant ordered the deceased Yearby to leave the premises. Witness Gilbert Porter testified that he went to the car to get their coats thinking that would encourage Yearby to leave. While he was at the car, Callie ran out of the house crying, "Don't kill him, Billy, don't kill him." Witness Porter then entered the house and saw defendant reach behind the bed and get a gun and come up with it, pointing toward Yearby. Porter stated he immediately ran from the house and when he got south of the house he heard three shots. Witness re-entered the house to see about his brother, Willie B., who was in the rest room drunk. When he re-entered, the defendant said, "I just got through killing the old son-of-a-bitch." Witness saw Yearby on the divan in a sitting position. Witness further testified he was a cousin to the deceased.

The officers were called and Policeman Richard Feiler testified that when he arrived he asked defendant what happened and defendant replied, "Well, I just shot the s. o. b. three times. He stole my money from me once." Defendant was arrested and placed in jail.

■ Defendant's story is in conflict with the state's testimony. He testified that while they were gathering pecans they saw a squirrel and discussed getting a gun to kill a squirrel and after selling the pecans they went by his house to get his .22 rifle. He stated, while the others waited in the car, he went in to get the gun which was behind a bed:

"* * * so as I laid down across my stomach that way across the bed, and reached over there to get my gun, and about the time I reached over there, why he has got me over the hip pocket and he said, 'give me that billfold, I want that money,' I said, 'I will give you that billfold.' So when I kinda twisted around on the bed and got up kinda straight, why he grabbed the gun. So when he grabbed the gun, why, we got in a scuffle, and he hauled off and hit me.

"He had ahold of the barrel like and he hauled off and hit me across the shoulder. He hit at my head and I ducked under his arm, that way, and he hit me right there, on the shoulder, and paralyzed my arm here. I can't raise it now. I can't straighten it. I can't get it no further up than that, without shoving it up, like that. So, when he did that, why, I reach over and got ahold of the trigger part of the gun and it shot * * *.

"Q. (Interrupting) Wait—pardon me. When he hit you on the shoulder with that gun, did the thing come apart? A. Yes, sir.

"Q. The blow was strong enough to break the gun in two? A. Oh, yes, yes, sir. So, I don't reckon he thought about the gun being loaded, and I just slipped the slide on the gun, I was used to it, you know, and it was loaded. I pulled the trigger and shot him; and he was in this bedroom with me, at that time, and he twisted around, and I don't know where he went, and I don't know how many times I shot him, or how many times I shot the gun. I know it held five. It was all long range shells. It held five long range in the magazine, the clip, and one in the barrel, and I always kept it full, all the time. So, I seen him run into this cot—the old cot sitting on the north side of the wall. He sat down there, on the cot pretty close to the front door, and rared his head back, like that, gasping. I goes out and Gilbert Porter was out there on the porch, or about the porch, I said 'Gilbert' I said 'run up to Mr. Hobson's right quick, and tell Mr. Hobson to

come down here, and to bring some-body with him.'"

From this record it is apparent that the trial court properly overruled defendant's demurrer and the motion for an instructed verdict. There appears to be a drastic conflict in the testimony. However, there is ample evidence on the part of the state, to create a question for the jury. The state's testimony is sufficient if believed to constitute the crime of murder. This court consistently has abided by the rule as stated in Plemons v. State, 53 Okl.Cr. 263, 10 P.2d 285, 286:

> "Trial courts * * * are limited in their power to interfere with the determination of issues of fact; and, where there are any facts from which the jury can legitimately deduce either of two conclusions, a motion to advise a verdict should always be denied, and the question of fact properly submitted under instruction given."

A review of the evidence and previous decisions of this court compel us to hold adverse to defendant's contention in this regard.

■ The defendant next complains that the court erred in permitting pictures of the deceased to be introduced in evidence. The pictures consist of two scenes showing the deceased lying across the bed with his shoulders and head resting against the wall, and one purporting to show a hole in a mattress evidently covering a bed. There is nothing gruesome about these pictures. The deceased is fully clad and appears to be asleep or passed out. One picture shows a small spot of blood on deceased's shirt over the heart region. Defendant in his brief contends the introduction of these photographs constituted error and cited Oxendine v. State, Okl.Cr., 335 P.2d 940, as authority. An examination will reveal that there is no comparison in the nature of the photographs. In the Oxendine case, supra, the photographs complained of were taken after an autopsy had been performed, showing the nude body of the deceased with ghastly and crude incisions made by the surgeon in performing the autopsy. They undoubtedly

were shocking to the jury and no question but what their probative value was far exceeded by their danger of prejudicing the jury. Not so in the instant case. The pictures were neither ghastly nor gruesome and the court fails to see how said pictures were detrimental to defendant's rights as they were not of such design as to influence the jury or arouse their passion.

■ Although it is error to receive in evidence gruesome photographs of a homicide victim, designed primarily to arouse the passion of the jury, such photographs are admissible when they are relevant to the issues before the court and their probative value is not outweighed by the danger of prejudice to the defendant. This court said in the case of Glenn v. State, Okl.Cr., 333 P.2d 597, 598:

> "Whether the probative value of a particular photograph outweighs its possible prejudicial effect is largely a question to be resolved by the trial court in the exercise of sound judicial discretion, and this court will only interfere when it appears from the record that the discretion has been abused."

Defendant advances the argument that the trial court erred in refusing to permit the defendant to introduce evidence as to the deceased having been committed to the Oklahoma State Penitentiary from Garvin county previous to the altercation resulting in his death. Defense placed on the stand the Court Clerk of Garvin County who identified a certified copy of a complaint against Jess Rico Yearby and also identified a commitment to the penitentiary. The county attorney objected because there was no proof that Jess Rico Yearby and the deceased were one and the same person. The court sustained the objection. Defense counsel made no effort to offer such proof. The court feels that the trial judge was justified in sustaining the objection and the defendant waived any right to complain by making no effort to offer said proof.

■ A study of the testimony in the instant case offers little justification for such an occurrence. The killing was no doubt

the result of drinking and quarreling during an evening of drinking bay rum which affords no excuse under the law. The evidence was sufficient to support the jury's verdict of guilty for the crime of murder. There are two verdicts that could have been rendered on a verdict finding defendant guilty of murder: Life in the penitentiary; or death in the electric chair. The jury chose the lessor of the two. We find nothing in the record to justify a reversal or modification.

The judgment and sentence of the trial court is therefore affirmed.

POWELL, P. J., and BRETT, J., concur.