Gerald PATE, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12901.

Court of Criminal Appeals of Oklahoma.

April 19, 1961.

Rehearing Denied May 24, 1961.

BRETT, Judge.

The plaintiff in error, Gerald Pate, defendant below, was charged by information in the district court of Pottawatomie County, Oklahoma, with the crime of murder (21 O.S.1951 § 701) committed by means of strangulation upon the body of Mary Jane Haygood. The crime was alleged to have been perpetrated on September 16, 1959 in said county and state. The information was filed on October 20, 1959. Defendant was tried by a jury, convicted, and his punishment fixed at death. Judgment and sentence was entered accordingly, from which this appeal has been perfected.

The record discloses the information was attacked on October 22, 1959 in the trial court by demurrer, which was overruled, and that ruling is not at issue on this appeal, for the apparent reason that the information is sufficient.

On October 22, 1959 a motion to quash and plea in abatement to said information was filed, and on November 8, 1959 overruled. This action is not questioned herein.

On December 29, 1959 a petition for change of venue was filed in the trial court under provisions of 22 O.S.1951 § 561, reading in part as follows:

> " * * * and if it be made to appear by the affidavits and examination of witnesses that a fair and impartial trial cannot be had in the county, a change shall be granted and the order made by the court."

Attached to the petition were three affidavits of citizens in Pottawatomie County. The gist of the petition and affidavits in support thereof, was that great prejudice had been engendered in the southern part of the county by reason of this crime committed therein, and that such prejudice had spread to the entire county, principally through the mediums of radio, television and newspaper publicity accorded the crime, so that the minds of the citizens of said

county were such that the defendant could not obtain a fair and impartial trial in said county; it being specifically alleged in said petition that it had been heard repeatedly and widely discussed in other communities that the defendant should be electrocuted without delay, and the right of due process should not be accorded. The three affiants and the defendant's attorney verified the petition.

To the defendant's petition for change of venue the State made response. Therein it was alleged that the wide publicity given to the case had created no fixed opinions in the minds of the public of Pottawatomie County that the defendant actually committed the crime, but the opinions of the people were largely that whoever did commit this crime should be punished. To the answer the State attached fourteen affidavits by responsible citizens, all to the effect that they did not have any fixed opinion about the guilt or innocence of Gerald Pate, and that it was their belief that the people of Pottawatomie County generally had no fixed opinion about the defendant's guilt or innocence, notwithstanding the television and radio broadcasts and the newspaper stories in the Oklahoma City and Tulsa papers, as well as those published in Pottawatomie County. That in discussions heard here and there the opinions of the people who discussed the matter, some speculated one way and some another. All of the State's affidavits were by citizens of Pottawatomie County, Asher in the southern part, Saint Louis in the southeast, Wanette in the southwest, Maud on the east side, Shawnee in the northern part, Tecumseh in the north central section, and McCloud in the northwestern part—a fair spread from over the county.

On January 7, 1960 the petition for change of venue was heard by Judge J. Knox Byrum of the district court of Pottawatomie County. At said hearing the defendant offered in evidence newspaper articles from Tecumseh Standard, and the Shawnee News-Star (six different issues) dealing with various news releases covering the crime, the results of the investigation, defendant's confession, and incidental matters in relation thereto preceding the trial of the case.

In addition to the foregoing the defendant offered as witness his mother, Mrs. Milam, who said she had been to Tecumseh, Shawnee, Wanette and Asher and talked with people in these communities and it was her opinion that her son could not get a fair and impartial trial in Pottawatomie County because of the existing prejudice against him. She got three of the persons to whom she talked to verify the petition for change of venue. Others she said refused to sign because they were afraid. Some of the people with whom she talked did not think her son actually did the killing, and they had read the papers she said, and that "it was just a mess", some of them even thought her son was framed.

Kenneth Kienzle, Jr., a law student and son of defense counsel, testified that he talked to people in Wanette, Asher, Tecumseh, McCloud and Shawnee, and about ninety per cent of the people with whom he talked told him they believed Pate guilty from what they had heard and read in the papers. He admitted that he, himself, formed an opinion from reading the newspapers that the defendant was guilty, but that after being exposed to what might be the evidence in the case, his opinion had changed.

The defendant rested and the State offered evidence in response.

J. C. Winterringer, assistant county attorney, testified for the State that his investigation made over the county disclosed to him that there was prejudice against the crime, but that the people with whom he talked had no fixed opinion as to the guilt or innocence of the defendant. He admitted he had a fixed opinion because of his investigation of the crime, and not from what he read in the papers or heard on radio or television. He believed Pate could obtain a fair trial in Pottawatomie County.

The defendant showed the Shawnee News-Star had a circulation in Pottawa-

tomie County of about 12,000, and in Lincoln County of between 1500 and 2000. It was estimated Pottawatomie County has a population of about 45,000, and Lincoln County of about 22,000. The Oklahoma City Times and Daily Oklahoman have a general circulation in the State of Oklahoma. Articles appearing therein were substantially the same as those appearing in the Shawnee paper. Mr. Bradshaw of the Shawnee paper, testifying as to the foregoing said, "I do not believe people formed fixed opinions from news information. They had prejudice against the crime but not against the defendant as to his guilt or innocence."

Thereupon the State and defense both rested, and the court overruled the petition for change of venue.

■ The defendant cites and relies on Sweet v. State, 70 Okl.Cr. 443, 107 P.2d 817, 821. Therein this Court said:

"The mere fact that the inhabitants of a county have read and heard of the commission of a crime does not disqualify them. To warrant a change of venue, it must be made to appear they have a fixed opinion as to the guilt or innocence of an accused to the extent that an accused cannot have a fair trial by an impartial jury. Johnson v. State, 35 Okl.Cr. 212, 249 P. 971; Newton v. State, 56 Okl.Cr. 391, 40 P.2d 688.

"The court was very lenient with the attorneys for the defendant in the extent to which he allowed them to go into the jurors' qualifications on their voir dire examination; and in this respect, we call attention to the fact that the defendant only used four of his peremptory challenges."

Herein the defendant exercised only three of his peremptory challenges, waiving the use of his remaining six such challenges. Moreover, the jury was selected from among 27 persons. Nine of the jurors disqualified, and were excused and two were excused by the State peremptorily.

■■ The case of Fry v. State, 91 Okl. Cr. 326, 218 P.2d 643, 645, bears great simi-

larity to the case at bar on this issue. Therein we said:

"The presumption of law is that a defendant can get a fair and impartial trial in the county in which the offense was committed; and if this is not true, the burden is upon the defendant who seeks a change of venue to establish his right thereto.

"On a motion for a change of venue, if upon the examination of the affidavits and counter-affidavits, and the examination of the witnesses in support of the application in open court, the court is convinced that a fair and impartial trial cannot be had in the county, then and under those conditions it is mandatory that he grant a change of venue, but not otherwise. He sits in judgment on that question just as any other question of fact that might be submitted to him, and unless it is clear that he has abused his discretion, or committed error in his judgment, his finding and judgment will not be disturbed by this court."

In the Fry case, supra, the defendant exercised six of his nine challenges, and nine admitted fixed opinions. We held in that case that we could not say the trial judge abused his discretion in denying the petition for change of venue.

■ In Rucker v. State, 88 Okl.Cr. 15, 195 P.2d 299, 313, 199 P.2d 221, we quoted from State v. Taylor, 138 Kan. 407, 26 P.2d 598:

"The ease with which a jury was obtained and qualified on their voir dire to try the cause, before the application for change of venue was denied, was of some probative force to show that a change of venue was not necessary to insure the defendant a fair trial."

■ Such is clearly the situation here involved. See also Rawls v. State, 86 Okl. Cr. 119, 190 P.2d 159, wherein we held the court had committed an abuse of discretion. But herein we cannot so hold, since the evidence, even some offered by the defense,

was that the people of Pottawatomie County, while prejudiced against the crime itself, had formed no fixed opinion against the defendant as to his guilt or innocence. Abby v. State, 72 Okl.Cr. 208, 114 P.2d 499, 500, 115 P.2d 266:

"The statute governing an application for change of venue is Oklahoma Statutes 1931, Section 2905, 22 Okl.St. Ann. § 561. The universal construction of this statute is that the granting of a change of venue is a matter within the sound discretion of the trial court, and unless it clearly appears that there is an abuse of such discretion, the decision of the trial court will not be reversed for failure to grant a change of venue.

"In this day of paved highways, the wide use of rural telephones, daily papers, and radios, the mere fact that the inhabitants of a county have read and heard of the commission of a crime does not disqualify them. To warrant a change of venue, it must be made to appear they have a fixed opinion as to the guilt or innocence of an accused to the extent that he cannot have a fair trial by an impartial jury.

"The same rule as above announced applies to the construction of Oklahoma Statutes 1931, Section 3055, 22 Okl. St.Ann. § 584, with reference to continuances."

That case announces the real test. Hence, measured by the foregoing rules, we cannot say the trial court abused its discretion in denying the petition for change of venue.

The facts and developments of this case cannot and should not be briefly stated. This is one of life's many tragedies, in which both the defendant and the State are entitled to more than cursory information as to why a life is extinguished.

At the trial the facts established by the 660 page record are that Mary Jane Haygood and the defendant had been friends for about a year preceding her death. Defendant, Gerald Pate, was 22 and Mary

Jane was 15 years of age. The defendant lived with his mother on a farm near Wanette, Oklahoma, while the decedent lived in Seminole with her parents. She was in the ninth grade in junior high school. On Monday, September 14, 1959 Mary Jane went to school. At the noon hour the defendant picked up Mary Jane and her younger sister. They drove around, and on the way back to school the car seemed to develop mechanical trouble. The younger sister got out and returned to school alone, leaving Mary Jane and the defendant Pate together in the car. Thereafter Mary Jane disappeared, which was reported to the police that evening.

It appears that the defendant and the decedent then left Seminole for Saint Louis, Oklahoma, by way of Maud, Oklahoma. After flat tires and depletion of their gas supply, they arrived at Mr. and Mrs. Strawn's place, near the old Bill Hall store building, and Mr. Strawn gave them a lift to defendant's farm home near Wanette, where they got some gasoline out of defendant's mother's car and returned to Pate's car. They drove away together, headed west, Mr. Strawn testified. Other than the defendant, Mr. Strawn was the last person to see Mary Jane alive. He identified her picture as being the girl with the defendant.

It further appears that the defendant had a case set for trial in Shawnee on Tuesday, September 15, 1959, in the district court. The defendant was called, but did not respond. A bench warrant was issued, and the sheriff began a search for him; and also search was instituted for Mary Jane, whose whereabouts were then unknown.

The record discloses that on Monday, September 21, 1959 the officers located the defendant in the family farm home, in a closet in the back bedroom. In the living room the officers observed a sawed-off shot gun, and a shell belt loaded with cartridges. The officers observed fingers holding the door of the closet in the bedroom. Sheriff Nicholson of Seminole County had his gun in his hand and hit the fingers, ordering

the man to come out. The defendant answered, "I will if you won't shoot". As defendant opened the closet door the officers saw two .22 calibre rifles leaning against the edge of the door, and defendant dropped his hand to one of them. He was wrestled to the bed, and the officers said, "Where is the girl?" The defendant said, "Let me up and I'll talk."

The defendant was placed under arrest and taken outside to the car. Later Sheriff Stroud of Pottawatomie County arrived with agent Bill Holt of the Crime Bureau.

Sheriff Stroud said the defendant first denied he ever took the decedent out of Seminole. He later said he let Mary Jane out of his car about dark at Bill Hall's old store building, and she walked away, east. The defendant was brought to Shawnee, and placed in jail.

The officers then went to the Milam farm again and began a search of the premises. About 300 persons engaged in this search. A soft spot was found that developed to be the decedent's burial place. State's exhibits 3, 4, 5 and 6 are photographs showing various stages of the process of disinterment.

Exhibit 4 shows a white zippered note book case, partly buried, and a human foot exposed above the soil. Exhibit 5 shows clothing that was found buried with the body. All these things were identified as Mary Jane's apparel, etc. Exhibit 6 shows the body of Mary Jane as it lay in the grave at the bottom of the excavation. Exhibit 7 was the white note book case, objected to as of no probative value, inflammatory, and admittedly her note book. The objection was overruled, and exhibit 7 was admitted in evidence. Exhibit 8 was a gunnysack containing the clothing taken from the grave. Objection to Exhibit 8 was made and defense counsel admitted the exhibit contained Mary Jane's clothing and it was withdrawn by the State. Objections to exhibits 9 and 10, photographs taken at the autopsy, were sustained by the court as being of no probative value, and inflammatory. No doubt this evidence was rejected on authority of Oxendine v. State, Okl.Cr., 335 P.2d 940.

On the premises where the grave was discovered a shovel of marine corps type was found in the barn, with blankets, a marine pack, etc., all of which had recently been in use. It appears that fresh soil on the shovel had the same chemical analysis as a specimen of earth taken from the grave. This shovel belonged to the defendant, an ex-marine, who had received an undesirable discharge before his term of enlistment was completed.

The grave of Mary Jane was discovered through an extensive search of the plowed areas of the farm. On the west side of the plowed field, in the river bottom, in a ditch, Gerald Pybas of Trousdale, Oklahoma, a geology student from Oklahoma University, found a sunken place near a big walnut tree. Probing around with a stick to see if there was any loose ground, the stick went down in the earth "real easy". He said his party detected an odor of something dead, and they began digging with their hands, and the stench became stronger. The sheriff and others were notified and the digging continued until the body and other contents of the grave were turned up.

The record shows corroboration of Pybas' testimony by other witnesses, who saw the body removed from the grave. It was definitely identified as that of Mary Jane Haygood.

Dr. Rudolph Emil Eyerer, professor at Oklahoma University, a qualified pathologist, conducted a post mortem examination of Mary Jane's body on September 27, 1959. The doctor testified that the body was identified as that of the Haygood girl. His examination of the body disclosed panties covering the genitalia and also a skirt tightly tied around the neck. He testified his conclusion as to cause of death was strangulation about five to eight days (or even longer) before the examination. He further stated that Mary Jane was not pregnant at death, and had never been pregnant.

It appears that on one occasion prior to the death of Mary Jane, Mrs. Haygood had forbidden her daughter to keep company with the defendant, and the defendant told her that he would get even with her some day.

The court outside the jury's presence heard evidence relative to an unsigned confession of the defendant, dated September 28, 1959 and as to how it was obtained. The court found, as reflected by the record, that the statement was voluntarily given without compulsion, threats or promises, and after the defendant was advised of his rights to an attorney and after having talked to his attorney before the confession was made, and admitted the same into evidence.

The statement was given before Hugh Collins, county investigator, on Monday morning, about 1 or 2 a. m., recorded by Verna Nelle Young in the presence of Harvey Cody, county attorney, Bill Holt, investigator of the State Crime Bureau; and Sheriff Herbert Strand. Thereafter it was prepared and submitted to defendant in the presence of undersheriff A. J. Rutherford, assistant county attorney J. C. Winterringer, deputies Casey Smith and Gunner Smith, and Frank Culp, on Monday afternoon. The defendant read the prepared statement, made a few corrections, but refused to sign it. Nevertheless, he said, "it was correct and all right". It appears the statement was partially given the day the body was found, and concluded some time after midnight on September 28, 1959.

Defendant asked to see an attorney before the statement was made, and Mr. Duke Skinner of the Shawnee bar was called. They retired to a separate room and talked for a short while alone. It further appears that defendant also talked to Mr. Tom Smith, an attorney in Wewoka, by telephone, shortly after the statement was made. Part of the time defendant was being interrogated his mother was present, and after talking with her, he decided not to sign the statement.

The defendant asked to produce Mr. Skinner for testimony on the statement, and for leave to subpoena him, which was granted, but he was never subpoenaed or called by the defendant.

Shortly after the statement was written and corrected by the defendant, the parents and defendant's brothers, who were in custody, were released. The defendant contends such was the consideration for the statement, but this is vigorously denied by the State with unequivocal testimony. The State's evidence disclosed that the feeling was so high against the family, they were held in protective custody. The court ruled the evidence in relation thereto should be heard by the jury. The defendant announced ready, and never called Mr. Skinner, as heretofore set forth. Thereafter the statement was admitted in evidence.

The statement in substance was as heretofore outlined up to the time the defendant and the decedent left Mr. Strawn's place. Thereafter the defendant related:

"I left her about an eighth of a mile from the house, while I went on to the house. I changed shirts in the house and got some sandwiches and other things, then walked back and met Mary Jane. We spent that night and Tuesday night, September 15, 1959 in the old hay barn house. On Wednesday, September 16, 1959, at about 4:00 o'clock in the afternoon we were looking around closer to the river and south of the hay barn and rested for a while under a big tree near the old section line. Mary Jane told me she wanted to go away with me and get married. She said that if I didn't take her away with me, she would "cop out" on me, that is, that she would tell the authorities about some of the burglary jobs I had pulled. She knew about these jobs because I had told her about them. She did not go along on any of them, although she was along one night when there was a fight and a cutting or stabbing. She and I were standing side by side when I grabbed her, whirled her around, and

used the hold which I learned in the Marines. I kept this hold on her throat for about a minute. I am sure she was dead before I released the hold. I felt to see if her heart was beating and it was not. I sat there for a while and remember shaking her once or twice, too, but I was sure she was dead. I dug the grave for her right there at the spot where I killed her. She was wearing a pair of my blue jeans at the time. I took these off of her and then got her skirt and "can-cans" and her notebook from the hay barn. I wrapped the skirt around her head and put her in the hole I had dug. I threw the "can-cans" over her and the notebook and her shoes in with her. Then I covered her and put some sticks and limbs over the grave.

"I later erected my tent about 100 feet west of this grave. I stayed there and in the hay barn until Monday, September 21, 1959, when I went to the house and was arrested. I planned to leave and went to the house to get some things to take with me."

In addition to the foregoing and separate therefrom, as to the method of Mary Jane's killing, the defendant voluntarily told Don L. Loftis, a television photographer, that he killed her with an old Japanese strangle hold, buried her on the spot, or just a few steps away, removed some blue-jeans from her body because they were his. He further said he killed her because "Mary Jane said she wanted to go away with me, and get married", and that "if I wouldn't take her away she would cop out on me on some burglaries I had pulled. She knew about these jobs because I had told her about them." He went to the old barn where they had stayed, some distance away from the grave, got some things and articles of clothing and buried them with her. No threats or promises were made by Loftis, who said defendant was not reluctant in telling these things, but talked quite freely about them.

After Loftis testified, the statement was then read to the jury. The defendant de-

murred to the State's case, and the demurrer was overruled.

Proof on behalf of the defendant is substantially the same as the State's to the point of leaving Mr. Strawn's place.

It appears the defendant further testified he had been in two car wrecks. In the first one his head went through the windshield, rendering him unconscious, he did not remember how long. In the second wreck he was thrown against the car dashboard. He did not relate any unconsciousness as a result of that wreck.

Defendant was permitted to offer his ninth grade diploma in evidence; also that he had earned his letter in football, basket ball and track in the Maud high school, as well as two 4-H club citations of merit.

The defendant testified as to an oil field accident he had in Hobbs, New Mexico on a job, after three weeks work. He got hit in the back with some lead tongs, knocking him up against the steel doghouse, injuring his head again, and rendering him unconscious. He was ultimately put in the Mc-Bride Hospital in Oklahoma City because of that injury, he testified. After that he related he could not stay on any job he got more than three weeks or a month or two. He said he just couldn't get along with "whoever was over me". He said he had headaches frequently when he was under a strain these pains were both sharp and dull throbbing pains, and at times he had dreams.

Defendant related that he married a minister's daughter, but this broke up and he then joined the Marine Corps. He didn't get along there, and was mustered out in about five months with an undesirable discharge, but not under dishonorable conditions.

He returned to Seminole and started running around with the Cortez gang. He testified that it was after this that he began the use of narcotics, such as amphetamine, Benzedrine, demerol, and heroin. Sometimes he took as many as eight or nine shots a day. Thereafter he began to commit burglaries. He was charged with a burglary in

Earlsboro, and intended to plead guilty in Shawnee the day he was last seen with Mary Jane Haygood, but he did not show up for the hearing.

Defendant admitted he had been going with Mary Jane about a year, but said she knew nothing of his past and wanted to marry him. On the day of her disappearance he testified they went to his Mother's farm, and were there two days and two nights, sleeping together in the barn, on hay, covering with blankets. He tried to get Mary Jane to return home, but to no avail, because she wanted to marry him.

They left the barn, the record reveals. The defendant related he had some of their things, and Mary Jane had his shot gun, fully loaded, and his sack of dope. He stated she told him she would shoot him if he didn't agree to marry her. He testified that Mary Jane's death was caused by strangulation, but he didn't know by whom. He didn't know what happened. He found himself wandering around the farm, he said, and came upon her body. He testified he didn't know whether or not he had anything to do with her death. Then he got scared and buried her, as hereinbefore set forth.

Defendant testified he had been taking demerol intravenously for about three days before the admitted incidents he related. He admitted that he told some people while he was in jail that he crept up on Mary Jane and applied a Japanese strangle hold on her, but he said he told that because of the threats to prosecute his folks. He said, on a promise to let them go, he made this confession. He denied telling them he took blue-jeans off of Mary Jane. He said he was sorry if he did kill Mary Jane, but he denied he did it.

On cross-examination defendant testified that he understood his parents would not be held if they were not implicated, and that they were held in protective custody, or for investigation. (It appears from the record that though defendant and Mary Jane were in the old hay barn on the Milam farm [Mrs. Milam is defendant's mother] the Milams knew nothing of it. The defendant would slip into the house when they were away and get food and supplies for Mary Jane and himself.) Under these conditions it is easy to understand why people who did not know this would suspect the parents of harboring defendant and be incensed against them, and also why they would be under investigation. But the record is clear that none of the members of his family knew of the defendant's crime until the body was found and defendant was arrested.

The defendant could not remember either the date or the month of his automobile accidents, but said Jimmy Barnes was with him in both wrecks. Barnes was not produced as a witness. Defendant admitted he was not taken to a hospital in consequence of either wreck, and no officer made an investigation of the wrecks. He didn't "go to a doctor for either accident, they didn't cripple us, or anything." He testified his oil field accident required treatment for his back, not for his head. He was not right certain about the time of the commencement of the dreams he testified to in chief. He said in response to the direct question "Did you kill Mary Jane?" "I hope I didn't." He admitted he lied to her parents in the Shawnee sheriff's office, when he said he didn't know where their daughter was, and that the last time he had seen her was when she got out of his car on Highway 39. Before the autopsy had been completed and his confession given he said Mary Jane died of strangulation, and admitted on cross-examination that he had said in his confession Mary Jane died of strangulation. The autopsy confirmed his statement concerning the cause of death. The defendant knew nothing of the doctor's conclusion when he told the officers Mary Jane died of strangulation, and the doctor knew nothing of his statement.

Proof in his behalf shows that after his wife left him he began to go to pieces, more or less, and got wilder.

Psychiatric proof by Dr. J. A. Rieger, after being qualified, testifying on behalf of the defendant, was to the effect of a history of head injury in an oil field acci-

dent, which caused headaches, resulting in the use of narcotics, but not of any dreams.

██ The foregoing constitutes a substantial statement of the evidence upon which the defendant was convicted. Though conflicting, it was sufficient to support the jury's verdict. Sadler v. State, 84 Okl.Cr. 97, 179 P.2d 479.

The defendant contends that the confession was obtained as the result of coercion, due to the fact his parents and two brothers were held in jail, and that he confessed in order to affect their release, hence he says his confession was not voluntary.

██ This contention, when measured in light of the entire record does not stand up. The defendant admitted he was told his parents and brothers were being held for protective custody, because of the feeling that they had been harbouring the defendant, and for the further reason of investigation to determine whether they were involved for that reason, or otherwise. It appears that he was told that if the investigation revealed they were not involved, they would be released. When the defendant confessed, that cleared them of possibility of involvement and the county attorney released them as it was his duty to do. As the conditions developed, they would have been released in any event whether or not the county attorney had given any assurance to the defendant. Moreover, the release of the defendant's parents and brothers, under the conditions herein presented, could not be construed as hope of reward for the defendant. Certainly it constituted no hope of reward for him. Such facts do not constitute compulsion or unlawful inducement to a confession. The county attorney was acting within his lawful duty in the foregoing regards, and where he so acts, as herein, such acts will not be construed as compulsion.

In Berry v. State, 4 Okl.Cr. 202, 111 P. 676, 31 L.R.A.,N.S., 849, this Court said:

"Primarily there are two facts which render a confession inadmissible as evidence: First, that it was obtained under any form of compulsion, so that to receive it in evidence would violate the defendant's constitutional privilege against self-incrimination; and, second, that it was made under such circumstances of hope or fear as to create a fair probability of its testimonial untrustworthiness.

"Prima facie any confession is admissible in evidence; and, where its admissibility is challenged by the defendant, the burden is on him to show that it was procured by such means or under such circumstances as to render it inadmissible, unless the evidence on the part of the state tends to show that fact."

██ In the case at bar, the trustworthiness of the confession is borne out by the separate voluntary admissions to Don Loftis, set forth herein. Certainly the defendant was under no compulsion from Loftis to make a confession, but the record shows he did. The confession made to Loftis is essentially the same as that made to the officers. This chain of circumstances clearly indicates that the defendant's confession was voluntarily made. The statements made to Loftis strips the contention that the unsigned confession was involuntarily made of the elements of truth. Under these conditions, we cannot hold that the trial court erred in holding the confession was voluntarily made without compulsion, or false promises, and therefore admissible. This is especially true in light of the further fact that it was read, corrected and pronounced a true statement by the defendant himself, even though he did not sign it.

The defendant did not meet the burden required of him to establish his contention as to the inadmissibility of the confession.

In this connection the defendant urges he repudiated his confession at the trial. But this contention is not well founded. The defendant's defense, a little short of a "confession and avoidance" when he says in effect, "I deny I killed her, but if I did, it occurred during a black-out, after she informed me she wanted me to marry her, and if I didn't she would shoot me." He

then admits that he came to, found Mary Jane's body, and buried her. This cannot be regarded as a repudiation of the confession, but more in the nature of an avoidance of it. In many respects his testimony confirms the written confession and certainly does not repudiate it.

Then the defendant contends there is a conflict in the confession and the post mortem or autopsy report. The doctor said Mary Jane died of strangulation by reason of the waist band of her skirt being tightly tied around her neck. The doctor's report was made before the defendant's confession. He did not have the advantage of the defendant's confession as to how her death was effected. But the defendant knew, and later told it. What he did not tell was that to doubly assure her death, he tied the skirt about her neck, after he had applied the Japanese strangle hold. The circumstances of her death belie the black-out theory, and are indicative of a cool, calculated determination to make sure of her death so she would not come to, get up and run away while he returned to the barn and procured her clothes and things, and the shovel with which to bury her. This does not constitute a conflict, but an affirmation of a determination, as the Attorney General says, to insure the finality of the job. His contention is without merit, under the circumstances.

Finally, in this vein, the defendant asserts that the trial court compounded the foregoing complaint by its refusal to hear evidence on the involuntary nature of the confession, out of the hearing of the jury. We have examined this contention carefully. The record discloses the defendant asked for leave of court to subpoena Mr. Duke Skinner during taking of testimony out of the jury's hearing in regard to the contention the confession was not voluntarily made. The court then advised the defendant's counsel that it was their right so to do and to offer him when they assumed the laboring oar. It conclusively appears from the record that at no time did the defendant call or offer Mr. Skin-

ner as a witness either out of the jury's presence on the question of whether the confession was voluntarily given or after the jury was recalled, and the evidence thereon was heard by the jury. When the conefssion was offered in evidence, counsel simply objected. When it appeared the jury might be recalled, the court asked defense counsel if he was ready for the jury to be called, to which he responded, "Ready—Give us an exception". If Mr. Skinner had any testimony relative to the confession, if defendant wanted it presented, the trial court gave him the opportunity so to do, both out of and in the presence of the jury, but clearly he waived its use by not calling him at either time. If the testimony was material, counsel for defendant is deserving of censure for not producing it, because the door was clearly open to him. The trial court followed the procedure as to hearing testimony on the admissibility of confessions reiterated in Williams v. State, 93 Okl.Cr. 260, 226 P.2d 989. This appears an attempt to create error by innuendo. Under the conditions herewith presented this contention appears to be wholly without merit.

Exhibits 3 to 6 inclusive were photographs of clothing, personal effects, and of Mary Jane's body in the grave before its removal, and defendant claims these exhibits were highly prejudicial and inflammatory to the defendant's rights. Particularly he says this is true in view of the defendant's offer to stipulate that Mary Jane's body was found buried at the particular spot, was uncovered and identified as hers, and that the note-book case, and clothing were hers, as described by the officers. The State did not agree to stipulate the effect of the evidence. Defendant objected to their introduction on the ground that they were of no probative value under the stipulation, that they were not relevant to any issue in the case, were ghastly and gruesome, and were offered with the obvious attempt to inflame the jury against the defendant.

This objection was directed especially to the introduction of exhibit 6, a

photograph of the excavated body of the deceased before removal from the grave. The question presented herein is similar to that involved in Mott v. State, 94 Okl.Cr. 145, 232 P.2d 166, 177, wherein we said:

"On appeal counsel argues that the nature of the wound of the child was otherwise proven and that the photographs were without probative value and that their admission was prejudicial and tended to inflame the jury. The defendant on trial, did not admit the killing. There was a question as to how the injury was inflicted and while the pictures may have tended incidentally to inflame the jury, this court has many times held that when a photograph is shown to be a faithful reproduction of whatever it purports to reproduce, it is admissible in evidence, as an appropriate aid to the jury in applying the evidence and that this is equally true whether it relates to persons, things, or places. See Seals v. State, 92 Okl.Cr. 272, 222 P.2d 1037; Roberts v. State, 82 Okl.Cr. 75, 166 P. 2d 111; Morris v. State, 6 Okl.Cr. 29, 115 P. 1030; People v. Harris, 219 Cal. 727, 28 P.2d 906; Burgunder v. State, 55 Ariz. 411, 103 P.2d 256; People v. Smith, 15 Cal.2d 640, 104 P.2d 510.

"This court has held that the introduction of photographs taken subsequent to a homicide is largely in the discretion of the trial court, and unless this discretion is abused it will not be a cause for reversal. Jackson v. State, 67 Okl.Cr. 422, 94 P.2d 851; Roberts v. State, supra; Langley v. State, 90 Okl.Cr. 310, 213 P.2d 886."

The question herein is not that the attempted stipulation bound the State, but were the pictures ghastly or gruesome, and of an inflammatory nature? They were in fact neither ghastly nor gruesome. In fact, the body covered by clay deposit in the grave looked like a crude terra cotta reproduction of a human body.

The other exhibits, 3 to 5 inclusive, were likewise not ghastly or gruesome. These photographs come within the pronouncements of Boling v. State, Okl.Cr., 341 P.2d 668, 671, wherein we said:

"The defendant next complains that the court erred in permitting pictures of the deceased to be introduced in evidence. The pictures consist of two scenes showing the deceased lying across the bed with his shoulders and head resting against the wall, and one purporting to show a hole in a mattress evidently covering the bed. There is nothing gruesome about these pictures. The deceased is fully clad and appears to be asleep or passed out. One picture shows a small spot of blood on deceased's shirt over the heart region. Defendant in his brief contends the introduction of these photographs constitute error and cited Oxendine v. State, Okl.Cr., 335 P.2d 940, as authority. An examination will reveal that there is no comparison in the nature of the photographs. In the Oxendine case, supra, the photographs complained of were taken after an autopsy had been performed, showing the nude body of the deceased with ghastly and crude incisions made by the surgeon in performing the autopsy. They undoubtedly were shocking to the jury and no question but what their probative value was far exceeded by their danger of prejudicing the jury. Not so in the instant case. The pictures were neither ghastly nor gruesome and the court fails to see how said pictures were detrimental to defendant's rights as they were not of such design as to influence the jury or arouse their passion.

"Although it is error to receive in evidence gruesome photographs of a homicide victim, designed primarily to arouse the passion of the jury, such photographs are admissible when they are relevant to the issues before the court and their probative value is not outweighed by the danger of prejudice to the defendant. This court said in the case of Glenn v. State, Okl.Cr., 333 P.2d 597, 598:

" 'Whether the probative value of a particular photograph outweighs its possible prejudicial effect is largely a question to be resolved by the trial court in the exercise of sound judicial discretion, and this court will only interfere when it appears from the record that the discretion has been abused.' "

■■■ Such is the situation in the case at bar. We cannot justly find that the trial court abused its discretion in admitting the photographs, even in the face of the defendant's contention that there was a stipulation, in view of the fact they were true representations of a factual situation, relevant to the issue and their probative value was not outweighed by the danger of prejudice to the defendant. These photographs added nothing to the admission contained in the defendant's confession. The worst that can be said of them is that they were cumulative in view of the stipulation, but in any event their probative value was for the jury. As was said in State v. Evans, 145 Wash. 4, 258 P. 845, 846:

"That one party has admitted a fact does not estop the other party to prove the fact by means of relevant evidence, inasmuch as facts when admitted, frequently lose their probative force."

Unless the State agrees to stipulate on a matter, there can be no valid stipulation. If such were not true, the defense could lay down the guage of battle and set the pattern for the prosecution. But we know of no law that requires the State to abdicate its right to try its side of a lawsuit as it sees fit, and not subject to the dictates of the defense, so long as its conduct is in keeping with the requirements of law.

Moreover, we do not see how these photographs could have the prejudicial effect claimed for them. Certainly they did not portray the defendant in any worse light, or to a greater extent or in any manner more convincing than he himself did in his confessions, and by his own testimony.

In regard to the latter, his testimony was clearly corroborative of the pictures positively establishing the burial of Mary Jane.

We are not unmindful of a case holding it was error, under similar conditions, to admit photographs of the killer's victims in a cave, but even there it was held harmless in light of defendant's own testimony. We refer to the case of Seadlund v. United States, 97 F.2d 742, 748, where the Seventh Circuit Court held:

"Complaint is made with reference to the introduction in evidence of a photograph of the inside of the dougout at Spooner, Wisconsin, taken at the time the defendant led his captors to the spot, and depicting the dead bodies of Ross and Gray. It is said this was calculated to have an inflammatory effect on the minds of the jury. We think this photograph should not have been admitted as it neither proved nor tended to prove any issue submitted to the jury. We do not see, however, how it could have had the prejudicial effect claimed. Certainly, the photograph did not portray the defendant as a 'heartless, cruel and savage person' to any greater extent or in any manner more convincing than the details of the crime as related by him, both in his confession after his arrest and his testimony as a witness at the trial."

And see People v. Sambrano, 33 Cal.App. 2d 200, 91 P.2d 221, with facts similar to those in the case at bar.

Under these conditions this point is likewise without merit.

The defendant's last proposition set forth in his brief is that the trial court erred in not sustaining his motion in arrest of judgment on the grounds of present insanity.

The allegations of the unverified motion as originally filed on February 8, 1960, are as follows:

"Comes now the defendant and files his motion in arrest of judgment and

asks that his sanity be determined and that his sanity be passed upon by a jury and asks that the sentence of this defendant be deferred until such a time that the sanity of this defendant may be determined. And for authority of this proceeding the defendant cites to the court Title 22 of Oklahoma Statutes Annotated, sections 1161, 1162 and the following sections through Chapter 22.

"And in this connection the attorney for the defendant states to the court through this motion that the defendant has shown evidence of being insane at this time. That his actions do not appear to be that of a sane person at this time. That a psychiatrist who testified at the trial of this case indicated that tests could be made upon the defendant with scientific instruments and therefore could be determined whether or not his brain had become affected. That counsel believes that such tests should be made. That said defendant is a pauper and is without funds. That he is unable to pay for such tests. And counsel asks that such tests be made upon the defendant at the expense of the county or state to determine whether or not the defendant is now insane or in a state of insanity. That such tests should be made before a jury is impaneled to try said defendant on issue of insanity. And counsel asks that he be committed to some state institution or insane asylum where such tests can be made upon defendant."

The pertinent part of the verification by defendant's sister made on February 9, 1960, the date of hearing, reads as follows:

"I have had occasion to observe this defendant upon this 9 day of February, 1960, and in my opinion he appears to be in a state of insanity. That I determine this from his actions and from conversation with him."

There were no further affidavits and no sworn testimony offered in sup-

port of the motion. The motion in arrest of judgment was overruled with exceptions. To support this record, the defendant relies upon Berwick v. State, 94 Okl.Cr. 5, 229 P.2d 604, 605. In that case this Court stated the rule in paragraphs 1 to 4 inclusive, as follows:

"1. Under Sec. 1162, et seq, Tit. 22 O.S.A., if a doubt arises in the mind of the court as to the sanity of the defendant, he must order a jury to be impaneled from the jurors summoned and returned for the term, or who may be summoned by direction of the court, to inquire into the sanity of the defendant, either before the trial or before judgment and sentence is pronounced.

"2. This doubt may arise in the mind of the court upon application for a continuance, motion for new trial, motion in arrest of judgment, by ex parte affidavit or declaration of a bystander, or the court of its own motion; and while the court cannot act arbitrarily in the matter, it has the right to look to the source of the information, and come to a proper conclusion, from all the facts and circumstances, whether there is a doubt in his mind as to the sanity of the defendant.

"3. If a claim coming from a reputable source is made, either at the beginning of the trial or at the time for judgment and sentence, that the defendant is insane at the time, with a reasonable showing or tender of proof in support thereof, it is the duty of the court to submit the question to a jury.

"4. When the motion is made and supported by such a showing, then a legal doubt of defendant's sanity arises, and it is the duty of the trial court to impanel a jury and to try the issue. While a trial judge may personally have no doubt of defendant's sanity, yet if the motion and showing in support thereof is substantially as outlined, it is sufficient legally to raise a doubt. In such case, a refusal to sub-

mit the issue to the jury is an abuse of discretion."

Defendant also relies upon Johnson v. State, 73 Okl.Cr. 370, 121 P.2d 625, in which the law is stated in identical language.

In the latter case, the opinion reveals a substantial affidavit of defendant's wife, detailing facts upon which the allegation of insanity is based, and a lengthy statement of counsel likewise detailing facts upon which the allegation was based, such as a history of family insanity. Such is similarly the situation in Berwick v. State, supra.

■ But that is not the situation in the showing herein made. The motion by counsel is predicated upon conclusions based upon adjudicated facts in the trial that the defendant was not insane when the act was committed, which can not now be asserted herein as a basis for relief as to present sanity. See Mitts v. State, Okl. Cr., 345 P.2d 913, wherein we said the jury's determination of that issue was conclusive.

■ The motion is also based upon conclusions of both counsel and defendant's sister as to present sanity not supported by any positive facts to sustain the motion. The state of the record is not such a reasonable showing or tender of proof in support thereof as was contemplated in either the Berwick or the Johnson case. Where there is showing supported by a reasonable tender of proof, this Court has consistently held that it is an abuse of discretion for the trial court not to submit such issues to the jury. Under the conditions herewith presented, the showing made was not such as to create a reasonable doubt in the mind of the trial court as to the defendant's sanity. We cannot hold herein that the trial judge abused his discretion in overruling the motion in arrest of judgment.

If on a proper showing it should subsequently develop that the defendant is presently insane, under the provisions of statutes (22 O.S.1951 §§ 1161–1167) and Mitts v. State, 82 Okl.Cr. 367, 170 P.2d 563, and Mitts v. State, Okl.Cr., 345 P.2d 913, resort to the law for relief is available both to the defendant and the State on proper showing. The last cited opinion, and the provisions of 22 O.S.1951 §§ 1005 to 1008 inclusive relate to persons under death sentence who become insane, or regain sanity after judgment and sentence.

But this relief, as the statute says, must be for "good reason", or as above set forth, must be supported by a reasonable tender of proof, not mere conclusions, surmise, or wishful thinking of relatives who cannot be condemned for going the last mile.

■ On the contention raised in oral argument but not briefed, that the trial court erred in not granting a continuance, if the record supported the argument thereon made, there would be merit in this contention. It appeared at the argument that counsel at the trial had been appointed as defense counsel only shortly before the trial, but such is not the case. The case came on for trial on January 11, 1960. The preliminary was held on October 15, 1959. On December 29, 1959 the defendant filed his motion for change of venue. On January 7, 1960 the defendant was served with a complete list of witnesses, together with their post office addresses, as provided by Article II, § 20, Oklahoma Constitution. On the same day, January 7, 1960, defendant's motion for change of venue was overruled, at which time defendant moved for the continuance, principally on the ground of insufficient time to prepare for trial. It appears from the record that defense counsel at the trial conducted the defense at the preliminary hearing, at which time thirteen of the twenty-eight witnesses were examined and on the hearing that he cross-examined the witnesses, whose testimony was transcribed and available to him.

■ Moreover, it appears that possibly without exception all witnesses were sub-

poenaed on December 21 or 22, 1959, to appear at the trial on January 11, 1960. This was all a matter of public record and available to the defendant from that date on. Furthermore, the State complied with the provisions of Art. II, § 20, Oklahoma Constitution on January 7, 1960 by serving on the defendant more than two days before trial a list of the witnesses with their post office addresses to be called in chief on behalf of the State. This list was served on defendant's counsel. Substantial compliance with this provision is sufficient. Wheeler v. State, 85 Okl.Cr. 248, 187 P.2d 266.

We have examined this record and find that the only witnesses used in chief against defendant and not served with subpoenas were Mary Hensley, court reporter, who read without objection the testimony of Taylor Rogers, state chemist, which she had taken at the preliminary; and LeRoy Neal, whose testimony was cumulative. No objection was raised to either witness. Rogers' testimony was permitted by agreement of counsel, Rogers being physically incapacitated to appear. The Neal testimony being cumulative, was admissible under authority of McKee v. State, 38 Okl.Cr. 132, 259 P. 607; Havill v. United States, 5 Okl.Cr. 334, 115 P. 119. It thus becomes apparent that there is no merit in the defendant's contention.

The judgment and sentence of the district court of Pottawatomie County is accordingly affirmed.

The time originally set for the execution of the defendant Gerald Pate having passed pending this appeal, it is ordered that the judgment and sentence of the district court of Pottawatomie County be carried out by the electrocution of Gerald Pate by the Warden of the Oklahoma State Penitentiary on Friday, the 7th day of July, 1961.

BUSSEY, J., concurs.

NIX, Presiding Judge.

I have carefully reviewed the record in the case at bar. I find no error of law to justify this Court's interference with the jury's verdict.